UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


Melissa Dumont, as the Personal Representative
for the Estate of Robert Donald Hutt,

      Plaintiff,

      v.                                    Civil Action No. 2:14-cv-209

Corrections Corporation of America,
Iman Gonzalez, Keith Ivens, Teresa
Lanier, Correct Care Solutions, LLC,
Michael E. Rapaport, Mitchell Miller,
and Andrew Pallito,

      Defendants.


## REPORT AND RECOMMENDATION
(Doc. 27)

      Plaintiff Melissa Dumont, as Personal Representative for the Estate of Robert

Donald Hutt, brings this suit under 42 U.S.C. § 1983 and under Vermont state tort law for

alleged unconstitutional and negligent conduct relating to Hutt's medical care while he

was in the custody of the Vermont Department of Corrections (DOC).  Specifically, as

relevant to the Motion addressed here, Plaintiff alleges that, while Hutt was housed at

Corrections Corporation of America (CCA)'s Florence Correctional Center (FCC) in

Florence, Arizona, CCA employees Defendants Dr. Keith Ivens, Dr. Theresa Lanier, and

Iman Gonzalez (the "Individual CCA Defendants") failed to properly or timely diagnose

Hutt's late-stage osteosarcoma. (*See* Doc. 61 at 2.)[1] Also according to Plaintiff, after

Hutt's femur "snapped" on November 27, 2013, his emergency surgery on that date, and

his osteosarcoma diagnosis in December 2013 (*id.* at 8, ¶¶ 24–26), the Individual CCA

Defendants failed to properly treat and care for Hutt until March 2014, when Hutt left

FCC and returned to Vermont (*see id.* at 10–11, ¶ 38).

Currently pending is the Individual CCA Defendants' Motion to Dismiss under

Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. (Doc. 27.) The Motion is

supported by affidavits from each of the three Individual CCA Defendants. (Docs. 27-1,

27-2, 27-3.) Plaintiff opposes the Motion. (Doc. 41.) In support, Plaintiff includes

exhibits constituting emails between the Individual CCA Defendants and DOC officials.

(Docs. 41-1, 41-2, 41-3.) The Individual CCA Defendants filed a Reply on February 27,

2015. (Doc. 52.) Plaintiff filed a "Sur-Response" on March 13, 2015. (Doc. 55.)[2]

The court heard argument on the Motion to Dismiss on April 8, 2015. For the

reasons discussed below, I recommend that the Individual CCA Defendants' Motion to

Dismiss (Doc. 27) be GRANTED and that Plaintiff's claims against the Individual CCA

Defendants be DISMISSED without prejudice for lack of personal jurisdiction.

---

[1] Osteosarcoma, or osteogenic sarcoma, is "the most common and malignant of bone sarcomas [cancers]." *Stedman's Medical Dictionary* 1720 (28th ed. 2006).

[2] The Local Rules do not provide for surreplies, and Plaintiff did not request leave for such a filing, but Defendants have not objected to the surreply, and thus I have considered it.

## **Background**

The following background is material to the pending Rule 12(b)(2) Motion and is drawn from the allegations in the Second Amended Complaint and affidavits and exhibits submitted by the parties in connection with the Motion. CCA is a corporation with its principal place of business in Tennessee. (Doc. 61 at 4, ¶ 5.) DOC entered into a contract with CCA in January 2007 to house Vermont inmates in CCA facilities. (*Id.* at 6, ¶ 14.) In May 2010, DOC and CCA amended the contract to house Vermont inmates at FCC. (*Id.*) According to Plaintiff, CCA has a "corporate mission to reduce costs," a mission in which CCA's agents and employees participated. (*See id.* at 13, ¶ 50.)

The contract required CCA to "house, guard and provide all necessary care for certain inmates under the care and custody of DOC." (*Id.* at 6, ¶ 14.) Under the contract, DOC paid CCA a daily rate of $62.17 per inmate to house the Vermont inmates. (*See id.*) The FCC facility in Florence is an approximately 1,800-bed facility that houses mostly federal inmates, but that since 2011 has housed approximately 40 Vermont inmates. (Doc. 27-1 at 1, ¶ 2.)

At the time of the Individual CCA Defendants' challenged conduct, Hutt was a Vermont inmate housed at FCC. (*See* Doc. 61 at 4, ¶ 4.) Defendant Ivens was at all relevant times the Regional Medical Director for CCA in Florence, Arizona. (*Id.* at 4, ¶ 6.) Defendant Gonzalez was at all relevant times the Health Services Administrator for CCA at FCC. (*Id.* at 4, ¶ 7.) Defendant Lanier was at all relevant times CCA's Medical Director, and was Hutt's physician at FCC. (*Id.* at 5, ¶ 8.) Each Individual CCA Defendant was allegedly involved in Hutt's medical treatment.

After Hutt's femur fractured in November 2013, the Individual CCA Defendants had email correspondence with DOC officials in Vermont. (*See* Docs. 41-1, 41-2, 41-3.)[3] Hutt returned to Vermont's Southern State Correctional Facility in March 2014. (Doc. 61 at 11, ¶ 41.) Hutt passed away in Vermont on October 27, 2014. (*See id.* at 3–4, ¶¶ 3–4.)

None of the Individual CCA Defendants live or have ever lived in Vermont; none own any property in Vermont; and only Defendant Lanier has ever been to Vermont—in her case, for a "day or two" a "couple years ago" while on vacation. (Doc. 27-1 ¶ 4; Doc. 27-2 ¶ 3; Doc. 27-3 ¶ 3.) At the time of the events in question, each Individual CCA Defendant lived in Arizona. (Doc. 27-1 ¶ 3; Doc. 27-2 ¶ 2; Doc. 27-3 ¶ 1.) Defendant Ivens now lives in Nashville, Tennessee. (Doc. 27-1 ¶ 3.) Defendant Lanier still considers Arizona to be her "home base," but has taken a job in Oregon and now splits her time between those two states. (Doc. 27-2 ¶ 2.) Defendant Gonzalez left CCA in 2014, took her husband's last name, Arroyo, and now lives in Texas. (Doc. 27-3 ¶ 2.)

## Analysis

### I. Rule 12(b)(2) Standard

The court may determine a Rule 12(b)(2) motion on the basis of pleadings and affidavits alone, or it may permit discovery, or it may conduct an evidentiary hearing. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam). Where a court determines the motion on the basis of pleadings and affidavits,

---

[3] According to Plaintiff, the email correspondence shows that each Individual CCA Defendant "had daily interaction and communication with Vermont." (Doc. 41 at 4.) The Individual CCA Defendants say that the correspondence was less extensive than Plaintiff's characterization, and in many cases the emails were simply regarding "administrative" matters. (Doc. 62 at 6 n.1.)

the plaintiff's burden is to "'make a prima facie showing that jurisdiction exists.'" *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010)). Thus, Plaintiff may defeat the Rule 12(b)(2) Motion by pleading "legally sufficient allegations of jurisdiction." *Dorchester*, 722 F.3d at 84 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). The pleadings and affidavits must be construed in the light most favorable to Plaintiff, with all doubts resolved in Plaintiff's favor. *Id.* at 84. However, the court need not draw "argumentative inferences" in Plaintiff's favor, nor should the court "'accept as true a legal conclusion couched as a factual allegation.'" *In re Terrorist Attacks*, 714 F.3d at 673 (quoting *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998)).

## II.     No Prima Facie Showing of Jurisdiction

Resolving personal jurisdiction over the Individual CCA Defendants in this federal-question case requires a two-step inquiry: first the court examines the long-arm statute of the forum state (Vermont), and second the court analyzes "whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." *In re Roman Catholic Diocese of Albany, New York, Inc.*, 745 F.3d 30, 37–38 (2d Cir. 2014) (per curiam) (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010)). Because Vermont's long-arm statute, 12 V.S.A. § 913(b), extends personal jurisdiction to the full extent permitted by the Due Process Clause, the analysis in this case involves only a single step: whether personal jurisdiction comports with due process. *Id.* at 38.

The "canonical" due process opinion regarding personal jurisdiction is *International Shoe Co. v. Washington*, 326 U.S. 310 (1945). *In re Roman Catholic Diocese of Albany*, 745 F.3d at 38 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853 (2011)). In *International Shoe*, the Supreme Court held that "a State may authorize its courts to exercise personal jurisdiction over an out-of-state defendant if the defendant has 'certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Goodyear*, 131 S. Ct. at 2853 (alteration in original) (quoting *Int'l Shoe*, 326 U.S. at 316). Thus the constitutional analysis involves two related components: the "minimum contacts" inquiry and the "reasonableness" inquiry. *Chloé*, 616 F.3d at 164.

## A.     Minimum Contacts

For the purposes of the minimum-contacts inquiry, there are two types of jurisdiction: "specific" and "general." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). General jurisdiction exists where the defendants' affiliations with the forum "are so 'continuous and systematic' as to render them essentially at home in the forum State.'" *In re Roman Catholic Diocese of Albany*, 745 F.3d at 38 (quoting *Goodyear*, 131 S. Ct. at 2851). Here, there is no basis for asserting general jurisdiction over the Individual CCA Defendants, none of whom are domiciled in Vermont. "Only on truly exceptional occasions may general jurisdiction extend over individuals who are at home in a state that is not otherwise their domicile." *Reich v. Lopez*, 38 F. Supp. 3d 436, 455 (S.D.N.Y. 2014) (internal quotation marks omitted). This

is not such an exceptional case; there is no allegation that any of the Individual CCA Defendants are "at home" in Vermont.[4]

Specific jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 131 S. Ct. at 2851 (brackets and internal quotation marks omitted). Specific jurisdiction exists where "'the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 730 (2d Cir. 2012) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). The "purposeful availment" requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King*, 471 U.S. at 475 (citations and internal quotation marks omitted).

"In addition to the concept of a defendant purposefully availing itself of the protections of the law of the forum State, the Supreme Court has also found minimum contacts to exist when the defendant 'purposefully directed' the harmful effects of his activities at the forum State." *LiButti v. United States*, 178 F.3d 114, 123 (2d Cir. 1999). Physical presence in the forum state is not required. *MacDermid*, 702 F.3d at 730. In evaluating the strength of the Individual CCA Defendants' contacts with Vermont, the court must look to the "totality" of their contacts with the State. *Chloé*, 616 F.3d at 164.

---

[4] In the Sur-Response, Plaintiff seems to recognize this, confining her argument to specific jurisdiction. (Doc. 55 at 1.)

Here, the Individual CCA Defendants' contacts with Vermont are weak. None of them live or have ever lived in Vermont; none own any property in Vermont; and only Defendant Lanier has ever even visited Vermont. Plaintiff asserts, however, that the Individual CCA Defendants have minimum contacts with Vermont for a variety of reasons. I discuss each of these arguments below.

### 1. CCA's Contract and Jurisdiction over CCA

Plaintiff contends that, as employees and managers at CCA, the Individual CCA Defendants have minimum contacts with Vermont. (Doc. 41 at 2.) However, just because CCA might be subject to personal jurisdiction in Vermont by contracting with the Vermont DOC does not mean that CCA's employees and managers are necessarily also subject to jurisdiction here. *See Calder v. Jones*, 465 U.S. 783, 790 (1984) (employees' contacts with the forum are "not to be judged according to their employer's activities there"); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) ("[J]urisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him . . . ."); *In re Terrorist Attacks*, 714 F.3d at 681 (noting that it is "'well established that individual officers and employees of a corporation are not automatically subject to personal jurisdiction in New York simply because a court can exercise jurisdiction over the corporation'" (quoting *Pilates, Inc. v. Pilates Inst., Inc.*, 891 F. Supp. 175, 180–81 (S.D.N.Y. 1995))). As *In re Terrorist Attacks* makes clear, this conclusion applies to corporate officers as well as employees. Plaintiff's reliance on the Individual CCA Defendants' status as "high level managers" or

"officers" of CCA (*see* Doc. 41 at 4) is therefore not a sufficient basis for concluding that they are subject to the same personal jurisdiction as their employer.

Courts have reached the same conclusion in prison litigation specifically. *See Weldon v. Ramstad-Hvass*, 512 F. App'x 783, 788 (10th Cir. 2013) (contract between Wyoming and Minnesota related to the confinement of Wyoming prisoners in Minnesota did not subject Minnesota prison officials to jurisdiction in Wyoming); *Trujillo v. Williams*, 465 F.3d 1210, 1219 n.10 (10th Cir. 2006) ("The fact that the Virginia officials' contact with Mr. Trujillo came about because of a contract between the State of New Mexico and the State of Virginia is not enough, on its own, to subject the Virginia defendants to suit in New Mexico."); *Lodholz v. Puckett*, No. 03-C-0350-C, 2003 WL 23220723, at *6 (W.D. Wis. Nov. 24, 2003) ("It is not enough to subject Higgins [an Oklahoma CCA employee] to suit in Wisconsin for plaintiff to allege that her work with Wisconsin inmates housed in Oklahoma came about because of a contract between the state of Wisconsin and her employer, Corrections Corporation of America."). Plaintiff supplies no contrary authority.

Plaintiff's assertion that the Individual CCA Defendants are "agents" for CCA fares no better largely for the same reason that Plaintiff's argument based on the Individual CCA Defendants' status as high-level managers or officers is unpersuasive. At the April 8, 2015 hearing, Plaintiff suggested that this case was similar to *Mansfield*

*Heliflight, Inc. v. Heli-One Canada Inc.*[5]  In that case this court noted that the activities of a local company could permit personal jurisdiction over a foreign company where the local company is an "agent" or "mere department" of the foreign company.  No. 2:12-CV-36, 2012 WL 4479851, at *6 (D. Vt. Sept. 28, 2012) (quoting *Koehler v. Bank of Bermuda, Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996)).  *Mansfield Heliflight* is distinguishable, however, because it involves an inquiry about the relationships between companies, not between individuals and their employers.

### 2.    Source of Individual CCA Defendants' Salaries

Plaintiff asserts that the Individual CCA Defendants can be subject to personal jurisdiction in Vermont because "they were paid salaries funded with Vermont tax dollars."  (Doc. 41 at 6.)  The Individual CCA Defendants maintain that Plaintiff has supplied no factual basis or legal authority for that proposition.  (Doc. 52 at 5.)  According to the Individual CCA Defendants, the Vermont inmates comprised only 3% of the population at FCC, and thus the Individual CCA Defendants cannot have derived "significant financial benefit" from treating Hutt or Vermont inmates in general.  (*Id.* at 6.)

---

[5]  Plaintiff did not cite *Mansfield Heliflight* in her Opposition or Sur-Response, but I discuss it here nonetheless.  I note below several other cases that Plaintiff cited for the first time at the April 8, 2015 hearing.  I have considered all of those cases here, but the practice of referring to multiple cases at oral argument that were not cited in the memoranda denies the moving defendants an opportunity to present an informed response and denies the court the benefit of proper preparation.  The emphatically better practice is for counsel to include authorities in written legal memoranda.  *See Medrano v. Genco Supply Chain Solutions*, No. 1:10-cv-01555-LJO-SKO, 2011 WL 92016, at *7 n.12 (E.D. Cal. Jan. 11, 2011) (plaintiff's "citation to relevant authority for the first time at a hearing was inappropriate because [defendant] was deprived of any fair opportunity to respond to Plaintiffs' arguments with regard to these cases").

It is unnecessary to attempt to determine the precise proportion of the Individual CCA Defendants' wages that might be traceable to outlays from Vermont. Presumably in the cases cited above—*Weldon*, *Trujillo*, and *Lodholz*—the out-of-state defendants received wages that might have been traceable at least in part to compensation earned by their employers under a contract with the inmate's home state. But that did not alter the outcome in those cases, nor has Plaintiff cited any contrary authority. I conclude that, to the extent that CCA received compensation under its contract with DOC and in turn paid the Individual CCA Defendants' salaries, that financial connection to Vermont is far too attenuated to be a basis for personal jurisdiction.

### 3. Email Communications

Plaintiff asserts that the Individual CCA Defendants' communications with and reports to Vermont DOC officials demonstrate that they were operating under the authority of DOC and were essentially "an arm of the Vermont Department of Corrections in Arizona." (Doc. 41 at 4–5.) Thus, according to Plaintiff, the Individual CCA Defendants' contacts with Vermont were not random, fortuitous, attenuated, or the result of the unilateral activities of others. (*Id.* at 5.) The Individual CCA Defendants maintain that their communications with Vermont did not constitute a "projection" into Vermont and did not trigger the "benefits and protections" of Vermont law. (Doc. 52 at 8.)

The email correspondence does not amount the purposeful availment of the privilege of conducting activities within Vermont. Here, the Individual CCA Defendants

were corresponding with Vermont officials because their *employer* had initiated a relationship with DOC. *See Artec Distrib., Inc. v. Video Playback, Inc.*, 799 F. Supp. 1558, 1561 (D. Vt. 1992) (mere correspondence between parties did not establish minimum contacts "since defendants never actively sought out or initiated the relationship"). The emails pertained to care that the Individual CCA Defendants provided in Arizona. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 788 (2d Cir. 1999) (concluding that, although Puerto Rico defendant communicated with plaintiff in New York, defendant did not in any of those communications "project itself into New York to participate in any activities localized in the state"); *Maranga v. Vira*, 386 F. Supp. 2d 299, 306 (S.D.N.Y. 2005) ("[C]ommunications into New York will only be sufficient to establish personal jurisdiction if they were related to some transaction that had its center of gravity inside New York, into which a defendant projected himself." (internal quotation marks omitted)).[6] Here, the "center of gravity" of the treatment at issue is in Arizona, not Vermont. I treat immediately below Plaintiff's argument that the email correspondence is evidence that the Individual CCA Defendants were an "arm" of DOC.

### 4. Individual CCA Defendants Are Not Vermont State Officials

Plaintiff suggests that the Individual CCA Defendants, through their employment with CCA, were "acting as an arm of the Vermont Department of Corrections." (Doc. 41

---

[6] *Bank Brussels* and *Maranga* involve analysis under New York's long-arm statute rather than the due process clause, but I consider them in the due-process analysis insofar as they represent one approach to evaluating the totality of the Individual CCA Defendants' contacts with Vermont.

at 2.)  Plaintiff also asserts that the Individual CCA Defendants are subject to jurisdiction in Vermont because their employer had assumed an "essential state function" of housing prisoners.  (*See id.* at 2, 3.)  However, Plaintiff cites no authority supporting either proposition.

At the April 8, 2015 hearing, Plaintiff suggested that a Vermont Superior Court decision in *Prison Legal News v. Corrections Corporation of America* supports her position.[7]  In that case, the Superior Court held that the governmental function performed by CCA under a contract with DOC "elevates CCA, to the extent of its involvement in the imprisonment of Vermonters, to the status of a public agency under [Vermont's Access to Public Records Act, 1 V.S.A. §§ 315–320]."  *Prison Legal News v. Corr. Corp. of Am.*, No. 332-5-13 Wncv, at 11 (Vt. Super. Ct. Jan. 10, 2014) (Bent, J.), *available at* https://www.vermontjudiciary.org/20112015%20Tcdecisioncvl/2014-5-30-31.pdf.  To the extent *Prison Legal News* supports the conclusion that CCA is performing a Vermont state function, it does not logically follow that all CCA employees are subject to personal jurisdiction in Vermont.[8]

Moreover, nothing in the email correspondence offered by Plaintiff (nor any other factual allegations or evidence) suggests that the Individual CCA Defendants had somehow been transformed into Vermont state officials, or that FCC was a Vermont state

---

[7]  Plaintiff did not cite *Prison Legal News* in her Opposition or Sur-Response, but I discuss it here nonetheless.

[8]  Indeed, personal jurisdiction was a distinctly separate issue in *Prison Legal News*, and it was an issue that was not in dispute—CCA had stipulated to personal jurisdiction in Vermont. *Id.* at 10.  *Prison Legal News* says nothing about personal jurisdiction in Vermont for CCA employees.

facility. *See Reiss v. Stansel*, No. CV 09-1760-PHX-RCB (ECV), 2011 WL 2111999, at *10 (D. Ariz. May 26, 2011) ("Defendants are employees of CCA, a private corporation; CCA is not a governmental entity, and Defendants are not state officials merely because they were acting under color of state law."); *see also Prison Legal News*, No. 332-5-13 Wncv at 3 (reciting term from contract between CCA and DOC where parties agree that CCA is an independent contractor and that neither CCA, its agents, or employees "shall be deemed an agent or employee of the State of Vermont").[9]

### 5. Hutt Did Not Voluntarily Leave Vermont

Plaintiff notes that at no point during the relevant time period did Hutt voluntarily leave Vermont. (Doc. 41 at 3.) Plaintiff asserts that it would be "wholly unfair and inappropriate to deny jurisdiction in Vermont when Mr. Hutt had no say in the discussion to move him to Arizona." (*Id.*) The Individual CCA Defendants say that Plaintiff's position is understandable, but that they are "no more responsible for [Hutt's] placement at FCC than he is." (Doc. 52 at 9–10.)

Plaintiff's argument on this point seeks to reverse the focus of the minimum-contacts inquiry by examining whether Hutt purposefully reached out to Arizona. The proper focus of the analysis is on the Individual CCA Defendants' contacts with Vermont. The fact that Hutt did not voluntarily leave Vermont does not affect the minimum-contacts analysis.

---

[9] A copy of the contract at issue does not appear in the record in this case, but since Plaintiff cited *Prison Legal News* at the April 8, 2015 argument, I cite it here for whatever value it may be worth on this issue.

The United States Supreme Court's decision in *World-Wide Volkswagen Corp. v. Woodson* does not require a contrary conclusion. In that case the Supreme Court held that the "fortuitous" circumstance that an automobile—sold in New York to New York residents—happened to suffer an accident in Oklahoma while the occupants were driving the car to a new home in Arizona, was insufficient to permit Oklahoma courts to exercise jurisdiction over the New York dealer that sold the car and its New York regional distributor. 444 U.S. 286, 295 (1980). Plaintiff asserts that Hutt's transfer to Arizona was not "fortuitous" like the New Yorkers' passage through Oklahoma was. Again, however, Plaintiff's argument focuses on the wrong actor. Hutt's lack of control over where he was housed says nothing about whether the Individual CCA Defendants purposefully availed themselves of the privilege of conducting activities within Vermont. What is relevant is that there is no allegation or evidence that the Individual CCA Defendants controlled what state their patients might be from—the only evidence is that their *employer* made those decisions. The fact that some of the Individual CCA Defendants' patients were from Vermont was, from their perspective, a "fortuitous" circumstance.[10]

### 6.     Effects Test

In her Sur-Response, Plaintiff advances a variety of arguments under the so-called "effects test" for personal jurisdiction. As noted above, under the "effects test," minimum contacts exist "when the defendant 'purposefully directed' the harmful effects

---

[10]  I return to the voluntariness issue below in the course of discussing the reasonableness prong of the personal-jurisdiction inquiry.

of his activities at the forum State." *LiButti*, 178 F.3d at 123.[11]  Here, according to

Plaintiff, the Individual CCA Defendants are subject to jurisdiction in Vermont because

their conduct "proximately le[]d to [Hutt's] death" and is therefore "intentional action

directly felt within Vermont's borders."  (Doc. 55 at 2.)

It is true that Hutt was a Vermont inmate, and that Hutt died in Vermont after

returning here.  However, the Individual CCA Defendants' work treating him is

insufficient to establish minimum contacts with Vermont.  That treatment took place in

Arizona.  Plaintiff has not shown that the treatment was "calculated to cause injury" in

Vermont.  *Calder*, 465 U.S. at 791.  The Individual CCA Defendants might have had

contact with Vermont inmates, but their actions or omissions in Hutt's case are not

activities directed toward Vermont.  *See Trujillo*, 465 F.3d at 1220 ("All relevant conduct

by the Virginia defendants occurred in Virginia, without any indication that their acts

were either 'aimed at' or 'ha[d] effect in' New Mexico." (quoting *Calder*, 465 U.S. at

787; *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1156 (9th Cir. 2006))); *see also*

*Panichas v. Bullock*, No. CIV-12-1222-W, 2014 WL 584751, at *4 (W.D. Okla. Feb. 12,

2014) (California prisoner claiming that CCA guards in Oklahoma allowed him to be

injured by other inmates asserted no facts suggesting that the Oklahoma CCA guards

---

[11]  It is true that in *Burger King*, the Supreme Court stated that personal jurisdiction exists "if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King*, 471 U.S. at 472 (internal quotation marks omitted).  But that statement does not mean that just any contact with a forum resident establishes minimum contacts with the forum.  *See In re Terrorist Attacks*, 714 F.3d at 674 (equating the *Burger King* Court's statement with the effects test); *Trujillo*, 465 F.3d at 1220 ("'[I]t is the defendant's contacts *with the forum state* that are of interest in determining whether personal jurisdiction exists, not its contacts with a resident of the forum.'" (alteration in original) (quoting *Institutional Food Mktg. Assocs., Ltd. v. Golden State Strawberries, Inc.*, 747 F.2d 448, 456 (8th Cir. 1984))).

"intentionally directed their actions at California"); *Witherspoon v. Maynard*, Civil Action No. PJM-09-2370, 2010 WL 2572855, at *3–4 (D. Md. June 22, 2010) (dismissing for lack of personal jurisdiction Maryland inmate's claims against Kansas CCA employees because "[t]he conduct giving rise to the claims asserted occurred in Kansas; the actions taken to manage the Kansas prison are not activities directed in Maryland, the forum state").

The Mississippi Supreme Court's decision in *Dunn v. Yager*, 58 So.3d 1171 (Miss. 2011) (en banc), does not suggest a contrary result.[12]  In that case a Mississippi resident, Dunn, brought suit in Mississippi state court against an Alabama doctor, Yager, alleging that Yager failed to obtain her informed consent and breached the standard of care in the course of prescribing certain medication. *Dunn*, 58 So.3d at 1176.  Approximately three weeks after Dunn started taking the medication, she "experienced an adverse reaction, which rapidly worsened over the next two days." *Id.*  Dunn was subsequently diagnosed with Stevens-Johnson Syndrome. *Id.*

Dunn appealed from the jury verdict in favor of Yager, and Yager cross-appealed, arguing that the trial court had erred in exercising personal jurisdiction over him. *See id.* at 1180–81.  Analyzing Mississippi's long-arm statute, which permits jurisdiction over nonresident defendants who have "committed a tort in Mississippi," the Mississippi Supreme Court concluded that Dunn's injury occurred in Mississippi, where she filled the prescription, consumed the drugs, and suffered the adverse effects. *Id.* at 1184–85.

---

[12]  Plaintiff did not cite *Dunn* in any of her filings, raising it for the first time at the April 8, 2015 hearing.

Performing the minimum-contacts inquiry, the Mississippi Supreme Court concluded that Yager was subject to general jurisdiction in Mississippi as a result of systematic and continuous contacts there—namely, his status as an approved Mississippi Medicaid provider, participation in certain preferred-provider organizations, and the Mississippi-based insurance provider that had approved Yager's treatment of Dunn. *Id.* at 1186.

Although the *Dunn* court noted that the effects of the medication were felt in Mississippi, that fact was relevant to the *statutory* analysis. But just because a long-arm statute permits personal jurisdiction does not necessarily mean that such jurisdiction comports with due process. *See Chloé*, 616 F.3d at 164 ("If the long-arm statute permits personal jurisdiction, the second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution."). On the constitutional analysis, the *Dunn* court did not rely on an effects rationale, but instead relied on Yager's continuous and systematic contacts with Mississippi. As noted above, there is no basis for concluding that the Individual CCA Defendants are subject to *general* jurisdiction in Vermont. For the purposes of the *specific* jurisdiction inquiry, an effect in the forum state is insufficient by itself to confer specific jurisdiction—the harmful effect must have been *purposefully directed* at the forum. If there was any basis for such purposeful direction in *Dunn*, the Mississippi Supreme Court did not mention it.

As discussed above, there is no basis for concluding that the Individual CCA Defendants purposefully directed harmful effects at Vermont. This court's decision in *Braman v. Mary Hitchcock Memorial Hospital* illustrates the point that a foreign medical provider's mere treatment of a forum resident is insufficient to constitute purposeful

direction of harmful effects. In that case, as recounted by the Second Circuit, plaintiff Daniel Braman injured his hand at his place of employment in Hartland, Vermont, and his employer took him for emergency medical treatment at a hospital in New Hampshire. 631 F.2d 6, 7 (2d Cir. 1980). Braman sued the hospital for malpractice arising out of the treatment he received. *Id.*

This court dismissed the suit under Rule 12(b)(2) "because there was no showing that the cause of action arose from the contacts or activities asserted as grounds for jurisdiction." *Id.* The Second Circuit ultimately reversed and remanded to determine whether the hospital might be subject to *general* jurisdiction in Vermont, but did not upset the determination that the hospital was not subject to *specific* jurisdiction. *See id.* Like the New Hampshire hospital's treatment of Braman, the Individual CCA Defendants' allegedly negligent or wrongful treatment of Hutt did not subject the treatment providers to specific jurisdiction in Vermont, despite the fact that the patient was from Vermont, and despite the fact that the patient might have suffered effects from the allegedly improper treatment after returning to Vermont.

### 7.    Alleged Conspiracy to Unacceptably Reduce Costs

Plaintiff asserts that the Individual CCA Defendants "appear to have conspired with Defendant CCA to reduce medical costs across the board, resulting in their failure to provide reasonable and necessary medical care." (Doc. 55 at 2.) At the April 8, 2015 hearing, Plaintiff suggested that the Tenth Circuit's decision in *Weldon v. Ramstad-Hvass*

supports this theory of minimum contacts.[13]  Also at the hearing, Plaintiff suggested that the Individual CCA Defendants might have benefitted from an incentive program with CCA under which CCA provided them with a financial incentive to reduce costs.[14]

The court in *Weldon* noted that "'[t]he existence of a conspiracy and acts of a co-conspirator within the forum may, in some cases, subject another co-conspirator to the forum's jurisdiction.'"  *Weldon*, 512 F. App'x at 789 (quoting *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1069 (10th Cir. 2007)).  The *Weldon* court explained the Tenth Circuit's "conspiracy jurisdiction" jurisprudence as follows:

> [A]llegations sufficient to support a prima facie showing of conspiracy do not *necessarily* establish jurisdiction over a nonresident co-conspirator.  In *Melea, Ltd.* we cautioned, "[T]o hold that one co-conspirator's presence in the forum creates jurisdiction over other co-conspirators threatens to confuse the standards applicable to personal jurisdiction and those applicable to liability."  Accordingly, there still must be minimum contacts as to each defendant, although they can be based on the co-conspirator's presence in the forum state, "if the conspiracy is directed towards the forum, or substantial steps in furtherance of the conspiracy are taken in the forum."

*Id.* (citations omitted).

The Tenth Circuit's approach is similar to the approach used in this court on the so-called "conspiracy theory of personal jurisdiction."  *Vt. Castings, Inc. v. Evans Prods. Co., Grossman's Div.*, 510 F. Supp. 940, 943 (D. Vt. 1981).  In *Vermont Castings*, the court stated that "[t]o meet due process requirements, a substantial connection between

---

[13]  Plaintiff did not cite *Weldon* in any of her filings, but the Individual CCA Defendants did cite it in their Reply.

[14]  Plaintiff notes that in *Bowman v. Corrections Corporation of America*, 350 F.3d 537 (6th Cir. 2003), the Sixth Circuit described such an incentive program in a contract between CCA and a doctor serving as medical director at a prison facility managed by CCA.

the conspiracy and the forum state must be shown." *Id.* at 944. "This connection exists where substantial acts in furtherance of the conspiracy were performed in the forum state." *Id.* "Furthermore, the nonresident co-conspirator 'must know, or have good reason to know, that his conduct will have effects in the (forum) state.'" *Id.* (quoting *Turner v. Baxley*, 354 F. Supp. 963, 977 (D. Vt. 1972)).[15]

I conclude that Plaintiff has failed to make a prima facie showing that "conspiracy jurisdiction" exists. Here, Plaintiff has not offered anything more than her conclusory assertion that any corporate mission to reduce costs or cost-reduction incentive program involved illegal means. *See Akerley v. N. Country Store, Inc.*, 620 F. Supp. 2d 591, 600 (D. Vt. 2009) (for a civil action for conspiracy, the parties to the alleged conspiracy must have an agreement, and must do something in furtherance thereof that is itself unlawful). Even assuming that there was a conspiracy, the Individual CCA Defendants' allegedly wrongful treatment of Hutt does not qualify as a substantial act in furtherance because the treatment was performed in Arizona, not Vermont.

### 8. Conclusion Consistent with this Court's Prior Cases

Previous cases from this court are consistent with the above conclusions. In *Bain v. Hofmann*, the court remarked that it was "not clear" that it would have personal

---

[15] In recent decisions within the Second Circuit—perhaps due in part to the threat of confusing the standards for personal jurisdiction and liability—at least some courts have rejected any "conspiracy jurisdiction" doctrine. *See In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2015 WL 892255, at *5 (S.D.N.Y. Mar. 3, 2015) ("The rules and doctrines applicable to personal jurisdiction are sufficient without the extension of the law to a separate and certainly nebulous 'conspiracy jurisdiction' doctrine."); *Tymoshenko v. Firtash*, No. 11-CV-2794 (KMW), 2013 WL 1234943, at *4–5 (S.D.N.Y. Mar. 27, 2013) (noting that use of conspiracy theory to establish personal jurisdiction "has been widely criticized by courts and scholars" and declining to consider contacts of coconspirators to establish personal jurisdiction).

jurisdiction over CCA workers in Oklahoma.  No. 1:06-CV-168, 2007 WL 1848035, at *3 (D. Vt. June 25, 2007).  In *Wool v. Vermont Department of Corrections*, Vermont inmate Kirk Wool filed a motion for preliminary injunctive relief alleging that, while he was housed at a CCA facility in Kentucky, CCA officials confiscated his legal materials.  No. 2:11-cv-188, 2001 WL 6740540, at *1 (D. Vt. Nov. 15, 2011), *adopted* 2011 WL 6748991 (Dec. 22, 2011).  The court denied Wool's motion, reasoning that, among other things, Wool had not shown a likelihood of success.  *Id.* at *3.  The court observed that it could not enter an injunction against a person over whom it lacked personal jurisdiction, and that Wool had not shown that the court had personal jurisdiction over any CCA official employed at the Kentucky facility.  *Id.* (citing *Malone v. Frank*, No. 07-C-377-C, 2007 WL 2362574, at *6 (W.D. Wis. Aug. 14, 2007)).  That was true despite the facts that the CCA officials' employer had a contract with Vermont, the officials' salaries came from an employer that received funds from Vermont under that contract, and the officials' alleged conduct was against a Vermont inmate.

### B.    Reasonableness

As the Second Circuit has observed, if minimum contacts are lacking, "the inquiry ends" and there is no need to evaluate the reasonableness prong.  *Metro. Life Ins. Co.*, 84 F.3d at 568 (quoting *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 465 (1st Cir. 1990)).  For the reasons discussed above, I conclude that Plaintiff has failed to make a prima facie showing on the minimum-contacts prong.  For the reasons discussed below, however, even assuming minimum contacts, Plaintiff has not made a sufficiently strong

showing that traditional notions of fair play and substantial justice require the Individual

CCA Defendants be subjected to jurisdiction in Vermont.

Courts consider five factors when evaluating the reasonableness of asserting

personal jurisdiction over an out-of-state defendant:

> A court must consider [1] the burden on the defendant, [2] the interests of the forum State, and [3] the plaintiff's interest in obtaining relief. It must also weigh in its determination [4] the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and [5] the shared interest of the several States in furthering fundamental substantive social policies.

*Chloé*, 616 F.3d at 173 (alterations in original) (quoting *Asahi Metal Indus. Co. v.*

*Superior Court*, 480 U.S. 102, 113 (1987)).  Here, the Individual CCA Defendants would

face some burden if they had to travel to Vermont for trial, although that inconvenience

cuts only weakly against reasonableness given modern communication and transportation

technology.  *See id.*  Regarding the second factor, Vermont may have some interest in

adjudicating a claim of the estate of a former Vermont prisoner.  *See id.* ("[A] state

frequently has a manifest interest in providing effective means of redress for its

residents." (internal quotation marks omitted)); *Bryant v. Salvi*, 141 F. App'x 279, 283

(5th Cir. 2005) (state has "a substantial interest in protecting the estates of its citizens").

However, Arizona may also have an interest in how CCA runs prisons within that state.

The third factor is Plaintiff's interest in obtaining convenient and effective relief.

Plaintiff does not argue that Hutt's Estate cannot obtain effective relief against the

Individual CCA Defendants in Arizona or the other states where those Defendants now

live.  *See Trujillo*, 465 F.3d at 1222 ("[T]he New Mexico defendants will be held

accountable for their conduct in New Mexico, and the Virginia defendants will be held accountable for their conduct in Virginia."). It is true that bringing separate suits would be less convenient for Plaintiff, so that does weigh slightly in Plaintiff's favor. In evaluating the fourth factor, "courts generally consider where witnesses and evidence are likely to be located." *Metro. Life Ins. Co.*, 84 F.3d at 574. This factor does not favor jurisdiction in Vermont, since none of the Individual CCA Defendants live in Vermont, and records relating to that conduct are likely in Arizona.

The final factor requires examination of policy arguments. As noted above, Plaintiff argues that it would be "wholly unfair and inappropriate to deny jurisdiction in Vermont when Mr. Hutt had no say in the discussion to move him to Arizona." (Doc. 41 at 3.) The court should reject Plaintiff's argument on this point. Notably, none of the cases discussed above have found prisoners' lack of choice regarding where they are housed to affect the reasonableness analysis. Nor has Plaintiff cited any cases so holding. Moreover, Plaintiff has not identified any public policy that requires corrections medical personnel to be subject to jurisdiction in all of the states where prisoners they treat reside. If anything, public policy would disfavor such a conclusion, since it would unreasonably subject those corrections personnel to suit in a multitude of jurisdictions.

## III. No Need for Jurisdictional Discovery

Plaintiff requests that if the court determines that the pleadings do not establish personal jurisdiction over the Individual CCA Defendants, then Plaintiff should be allowed to conduct jurisdictional discovery. (Doc. 55 at 7.) However, since Plaintiff has not made out a prima facie case for jurisdiction, the court need not authorize

jurisdictional discovery. *See Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 401 (2d Cir. 2009) (noting that a district court "is typically within its discretion to deny jurisdictional discovery when the plaintiff [has] not made out a prima facie case for [personal] jurisdiction" (second alteration added; internal quotation marks omitted)); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 255 (2d Cir. 2007) ("[T]he district court acted well within its discretion in declining to permit discovery because the plaintiff has not made out a prima facie case for jurisdiction.").

The areas of discovery that Plaintiff seeks are not a persuasive basis for granting discovery. First, Plaintiff seeks discovery regarding the extent to which the Individual CCA Defendants were paid with Vermont tax dollars. (Doc. 55 at 2.) However, as discussed above, it is unnecessary to attempt to determine the proportion of the Individual CCA Defendants' wages that might be traceable to outlays from Vermont. Second, Plaintiff seeks discovery regarding whether the Individual CCA Defendants participated in the creation of the contract between DOC and CCA to house Vermont inmates in Arizona. (*Id.*) On that issue, Plaintiff offers only her speculation that the Individual CCA Defendants "may" have participated in creating the contract between DOC and CCA. (*Id.*) Plaintiff advances no reason to suspect that the Individual CCA Defendants—all medical professionals—might have been involved in negotiating the contract that brought Vermont inmates to FCC.

## IV.  Dismissal Versus Transfer

Neither party has addressed whether, in lieu of dismissal of the Individual CCA Defendants for lack of personal jurisdiction, it might be more appropriate to sever the

claims against those Defendants under Fed. R. Civ. P. 21 and transfer them to the District of Arizona. Under Rule 21, a court may "sever any claim against a party." Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."[16] The court may act on its own motion to sever and transfer. *See Lead Indus. Ass'n, Inc. v. Occupational Safety & Health Admin.*, 610 F.2d 70, 79 n.17 (2d Cir. 1979) ("The broad language of 28 U.S.C. § 1404(a) would seem to permit a court to order transfer *Sua sponte*."); *Prospect Capital Corp. v. Bender*, No. 09 Civ. 826(HB), 2009 WL 4907121, at *7 n.9 (S.D.N.Y. Dec. 21, 2009) ("[A] court may order severance of a party or claim under Rule 21 of the Federal Rules of Civil Procedure *sua sponte*.").

Here, there appears to be no reason why Plaintiff's claims against the Individual CCA Defendants could not have been brought in Arizona. As for the question of convenience and fairness, courts consider a variety of factors including:

> (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties.

*D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106–07 (2d Cir. 2006) (alteration in original) (quoting *Albert Fadem Trust v. Duke Energy Corp.*, 214 F. Supp. 2d 341, 343

---

[16] The provisions of 28 U.S.C. § 1406(a) are similar, but there is no suggestion that venue is improper in Vermont, so § 1404(a) is the applicable transfer statute. *See Sylvester v. Pipino*, No. 1:12-cv-00057 (jgm), 2012 WL 5843143, at *3 (D. Vt. Nov. 19, 2012) (citing *Matera v. Native Eyewear, Inc.*, 355 F. Supp. 2d 680, 687 (E.D.N.Y. 2005)). In any case, the standards under both statutes are largely overlapping if not identical. *See id.* at *3 n.2.

(S.D.N.Y. 2002)).[17]  The first factor weighs against changing venue, since Plaintiff

selected Vermont as her forum.  That decision is given great weight.  *See id.* at 107

(citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981)); *see also Maranga*, 386 F.

Supp. 2d at 311 (where plaintiffs had not requested transfer, court noted that it was

"entirely possible that Plaintiffs would find transfer undesirable").

      The second and fourth factors are perhaps neutral, given that Plaintiff is in

Vermont; the Individual CCA Defendants are now in Tennessee, Texas, and Arizona; and

no party has articulated where other witnesses might be.  The third factor probably favors

Arizona, since documents and proof relating to Hutt's treatment in Arizona are likely to

be there.  The fifth factor plainly weighs in favor of venue in Arizona, since that is the

locus of the facts relating to the Individual CCA Defendants' treatment of Hutt.  No

witness has been identified as unwilling to testify, so the sixth factor is neutral.  The

parties have not articulated any arguments regarding their relative means, so the seventh

factor also appears to be neutral.  On balance the factors do not point decisively to

changing venue, nor has Plaintiff explicitly requested transfer in the event the Individual

CCA Defendants' Motion to Dismiss is granted, so I recommend against acting sua

sponte to sever and transfer.

---

[17]  There may also be a "'compelling reason'" for transfer where "a plaintiff's case, if dismissed, would be time-barred on refiling in the proper forum."  *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 435 (2d Cir. 2005) (quoting *Phillips v. Seiter*, 173 F.3d 609, 610 (7th Cir. 1999)).  Here, since Hutt suffered the fracture in November 2013 and osteosarcoma diagnosis in December 2013, it seems likely that a suit filed in Arizona would be timely under that state's two-year statute of limitations for personal injury and wrongful death.  *See* Ariz. Rev. Stat. Ann. § 12-542.

## Conclusion

For the reasons discussed above, I recommend that the Individual CCA Defendants' Motion to Dismiss (Doc. 27) be GRANTED and that Plaintiff's claims against the Individual CCA Defendants be DISMISSED without prejudice for lack of personal jurisdiction.

Dated at Burlington, in the District of Vermont, this 29th day of April, 2015.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).