UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Melissa Dumont, as Personal Representative
for the Estate of Robert Donald Hutt,

       Plaintiff,

       v.                               Civil Action No. 2:14-cv-209

Corrections Corporation of America,
Correct Care Solutions, LLC,
Michael E. Rapaport, Mitchell Miller,
and Andrew Pallito,

       Defendants.

## REPORT AND RECOMMENDATION
(Doc. 71)

Plaintiff Melissa Dumont, as Personal Representative for the Estate of Robert

Donald Hutt, brings this action under 42 U.S.C. § 1983 and under Vermont tort law for

alleged unconstitutional and negligent conduct relating to Hutt's medical care while he

was in the custody of the Vermont Department of Corrections (DOC).  (Doc. 61.)  For

relief, Plaintiff seeks damages in excess of $20 million.  (*Id.* at 20.)  Defendant Andrew

Pallito, Commissioner of the DOC, moves to dismiss under Fed. R. Civ. P. 12(b)(6),

arguing that (1) Plaintiff's damages claims against him in his official capacity are barred

by the Eleventh Amendment; (2) the complaint fails to sufficiently allege that Pallito was

personally involved in the alleged constitutional violation; (3) Plaintiff has failed to state

a claim under the Eighth, Fifth, or Fourteenth Amendments; and (4) Plaintiff's state-law claims are barred by the Vermont Tort Claims Act and by Pallito's absolute official immunity.  (Doc. 71 at 1–2.)

Plaintiff opposes Pallito's Motion to Dismiss.  (Doc. 75.)  Pallito filed a Reply on September 10, 2015.  (Doc. 80.)  The Court heard argument on the Motion on September 29, 2015.  (Doc. 84.)  On October 13, 2015, both parties filed supplemental memoranda. (Docs. 88, 89.)  For the reasons discussed below, I recommend that Defendant Pallito's Motion to Dismiss (Doc. 71) be GRANTED.

## Background

### I.    Prologue: DOC Faced Scrutiny Before Pallito's Tenure

I begin with some facts that, while not part of the Second Amended Complaint, are matters of public record and are referenced in Plaintiff's Response to the Motion to Dismiss (Doc. 75).[1]  Prior to Pallito's tenure as Commissioner, the DOC faced scrutiny concerning, among other things, DOC policies regarding the health of inmates.  A March 2004 report prepared for the Vermont Agency of Human Services concluded that the DOC was struggling "due to the enormous population pressures and significant inmate turnover that some of the facilities are experiencing."  Michael Marks & Philip McLaughlin, *Investigative Report into the Deaths of Seven Vermont Inmates and Related*

---

[1]  It is permissible to refer to matters of public record in the present context.  *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) ("[A] district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6) . . . .").  But it would have been preferable if Plaintiff had included these matters in her pleadings.  This is not the first time in this case that Plaintiff has advanced facts or authorities late in the adjudicative process.  (*See* Doc. 63 at 10 n.5.)  Moreover, in some instances in her Response, Plaintiff refers to materials or makes assertions without providing citations; that makes it difficult for the court to understand some of Plaintiff's arguments.

*Issue*s 71 (Mar. 13, 2004), http://www.doc.state.vt.us/about/reports/marks-mclaughlin/view.  The report mentioned that one potential response was contracting out correctional services, but cautioned that "[s]trong oversight" would be necessary to "ensure contract performance and cost containment."  *Id.*

In May 2004, the Vermont State Auditor issued a report concluding (among other things) that the DOC had "fail[ed] to properly monitor its contracts" and that as a result DOC's contractors had in some cases failed to provide adequate medical care to inmates. Office of the State Auditor, *Keys to Success: Improving Accountability, Contract Management & Fiscal Oversight at the Department of Corrections* 4 (May 26, 2004), http://auditor.vermont.gov/sites/auditor/files/Keys%20to%20Success.pdf.  The Auditor's report specifically found that the DOC did not have an "adequate, independent system to evaluate the quality of medical services" provided to inmates by the DOC's medical services contractor (Correctional Medical Services, at the time).  *Id.*  The Auditor recommended, among other things, that the DOC "[m]anage all service contracts to ensure contract performance and cost containment," *id.* at 5, and that the DOC "[e]stablish written policies and procedures to provide contract monitors with clear protocols to evaluate the performance of contractors," *id.* at 6.

At the time of the Auditor's May 2004 report, the DOC had recently entered into a contract with Corrections Corporation of America (CCA) to house Vermont inmates.  *Id.* at 63.  This was Vermont's first contract "with a privately-owned and operated prison company."  *Id.* at 64.  The Auditor noted that the DOC had selected CCA after

"follow[ing] the contracting procedures in Administrative Bulletin No. 3.5,"[2] and that the DOC was "implementing a comprehensive audit and quality assurance system." *Id.* But the Auditor also noted "areas of concern," including the contract's failure to specify minimum staffing levels, "qualification levels, background checks, and training." *Id.* The Auditor also noted that Vermont inmates, family members, and advocates had registered numerous complaints regarding CCA's Marion Adjustment Facility in Kentucky. *Id.*

In August 2010, Prison Legal News (PLN) sued Prison Health Services, Inc. (PHS) in Vermont Superior Court. *Prison Legal News v. Prison Health Servs., Inc.*, No. 622-8-10 Wncv (Vt. Super. Ct. filed Aug. 30, 2010).[3] PLN later reported that PHS was a medical-services contractor for the State of Vermont until the end of 2009 and that PLN had settled the 2010 suit against PHS in part because PHS had agreed to produce records related to the resolution of legal claims against PHS. Alex Friedmann, *PLN Settles Public Records Suit Against PHS in Vermont, Obtains Settlement Payout Information*, Prison Legal News (Dec. 15, 2012), https://www.prisonlegalnews.org/news/

---

[2] Vermont Agency of Administration Bulletin No. 3.5 ("Contracting Procedures") contemplates a bidding process, including Requests for Proposals (RFP) that "clearly explain the selection criteria to be used." *See* Vermont Agency of Administration, *Bulletin No. 3.5*, § VI(A)(1)(h), http://aoa.vermont.gov/Sites/aoa/files/pdf/AOA-Bulletin_3_5.pdf (last visited Oct. 20, 2015). Bulletin No. 3.5 also requires contracts to describe a management and monitoring process that the contracting agency will use to "monitor the contract." *See id.* § VII(A)(7).

[3] As with the public reports cited above, the Court may rely on case law as a matter of public record. *See Pani*, 152 F.3d at 75.

2012/dec/15/pln-settles-public-records-suit-against-phs-in-vermont-obtains-settlement-payout-information/.[4]  PLN reported that it learned that, between 2007 and 2011, PHS had settled six cases against it relating to the medical care it provided to Vermont inmates for a total of $1.8 million.  *Id.*

## II.    Hutt's Medical Treatment by CCA and Correct Care Solutions (CCS)

The allegations in Plaintiff's Second Amended Complaint are as follows.  In January 2007, Commissioner Pallito contracted with CCA to house Vermont inmates outside of Vermont in facilities operated by CCA.  (Doc. 61 at 6, ¶ 14.)[5]  "In May 2010, Defendants Pallito and CCA amended the Contract to house Vermont inmates" at a CCA facility in Florence, Arizona.  (*Id.*)  "The Contract required CCA to 'house, guard and provide all necessary care for certain inmates under the care and custody of DOC.'"  (*Id.*)  The contract called for CCA to be paid "a daily rate of $62.17" per inmate to house Vermont inmates.  (*See id.*)  According to Plaintiff, CCA had a "corporate mission to reduce costs."  (*Id.* at 13, ¶ 50.)  The contract also required CCA to comply with title 28, section 801 of the Vermont Statutes Annotated (regarding medical care of inmates) and to "provide medical care in accordance with the prevailing standard of care."  (*Id.* at 6–7, ¶ 17.)

---

[4]  The Court may take judicial notice of the fact that PLN reported as it did.  *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents . . . .").

[5]  A copy of the contract does not appear in the record, so the only details presently available to the Court regarding the contents of the contract are the allegations in Plaintiff's Second Amended Complaint.

Plaintiff asserts that, at the time of the contract, "it was well known and publicized that Defendant CCA did not provide safe housing and medically appropriate care to inmates." (*Id.* at 16, ¶ 76.)  According to Plaintiff, there were at that time "well documented reports of inmate abuse and violations of inmates' constitutional rights" at CCA facilities.  (*Id.* at 17, ¶ 77.)  Plaintiff claims that Pallito "failed to properly investigate and vet the conditions to which Vermont inmates would be subjected." (*Id.* at 2.)  Plaintiff also claims that Pallito "further failed to insure that Vermont inmates in CCA facilities were treated in accordance with Vermont law." (*Id.*)  Plaintiff maintains that "Pallito did not have an established policy in effect to ensure that Mr. [Robert Donald] Hutt received health care in accordance with the prevailing standard of care." (*Id.* at 7, ¶ 18.)

Robert Donald Hutt was a Vermont inmate committed to Commissioner Pallito's custody.  (*See id.* at 3, ¶ 4.)  Pallito sent Hutt "to the CCA facility in Florence, Arizona in 2010." (*Id.* at 6, ¶ 15.)  Beginning in February 2013, Hutt "complained to the medical staff in Florence" about left hip pain.  (*Id.* at 7, ¶ 20.)  If medical staff had ordered an X-ray of Hutt's left leg and hip at that time, it would have revealed that Hutt had osteosarcoma (bone cancer).  (*See id.* at 8, ¶ 22.)

Hutt filed over seven "Sick Call" slips regarding the pain between February and November of 2013.  (*Id.* at 7, ¶ 20.)  According to Plaintiff, CCA medical staff "ignored" Hutt's requests for treatment, concluded that he did not need treatment because he could perform his activities of daily living, and merely prescribed ibuprofen.  (*See id.*)  After

Hutt's "repeated requests for treatment," another physician at the facility met with Hutt and recommended he have an MRI. (*Id.* at 8, ¶ 21.) The medical personnel to whom Hutt had originally complained "ignored" that recommendation. (*See id.* at 8, ¶ 22.) They also failed to order an X-ray, even though that technology was available at the facility. (*Id.*)

On November 27, 2013, Hutt's femur "snapped" while he was standing in his cell. (*Id.* at 8, ¶ 24.) Hutt was transported to a hospital and received emergency surgery. (*See id.* at 8, ¶¶ 24–25.) "According to the surgical records, the femur abnormalities were obvious on sight." (*Id.* at 8, ¶ 25.) On December 5, 2013, "Hutt was diagnosed with osteosarcoma." (*Id.* at 8, ¶ 26.) CCA and its staff "did not inform Mr. Hutt of the cancer diagnosis until January 14, 2014." (*Id.* at 9, ¶ 27.) They also "did not authorize chemotherapy treatment" until that date. (*Id.*) Hutt did not begin chemotherapy treatment until January 28. (*See id.* at 10, ¶ 37.)

Hutt went back to CCA's Florence facility around December 3, 2013. (*Id.* at 9, ¶ 29.) At this time, "he was confined to a wheel[]chair" and had a wound from the surgery on his thigh. (*Id.*) The physicians at the hospital where the surgery was performed prescribed a six-inch thick mattress, but when Hutt returned he was initially assigned to a cell with a suicide-prevention bed—"a plastic molded bed without a mattress." (*Id.* at 9, ¶ 30.) After Hutt complained, he was provided with two mattresses that were one and one-half inches thick "with dirty bedding." (*Id.*)

The doorway of Hutt's cell on the medical unit was not "wide enough to allow entry with his wheel[]chair." (*Id.* at 9, ¶ 31.) Hutt's first night back at the Florence

facility, he "was forced to sleep in his wheelchair." (*Id.*) In order to have a bed and a mattress, Hutt "had to leave the medical unit and return to his cell in general population." (*Id.* at 9, ¶ 32.) But outside of the facility's medical unit, Hutt "was not permitted to leave the needle in his IV port," thereby forcing Hutt to "choose between access to a bed and IV medication." (*Id.*)

Medical staff at CCA "routinely failed" to administer Hutt's prescribed pain medication. (*Id.* at 10, ¶ 33.) Medical staff was also unable to reliably reestablish IV lines necessary to provide Hutt with antibiotics and other medication, so Hutt was "forced to maintain IV lines for days on end." (*Id.* at 10, ¶ 34.) Plaintiff claims that staff's inability to establish an IV was because they were insufficiently trained and supervised. (*Id.*) As a result, Plaintiff claims, Hutt "developed an infection in the surgical site." (*Id.* at 10, ¶ 35.) Hutt was also not provided with physical therapy after his surgery. (*Id.* at 10, ¶ 36.) As a result, Hutt developed deep vein thrombosis, requiring additional surgery. (*Id.*)

In March 2014, Hutt was transferred to the Southern State Correctional Facility (SSCF), a Vermont prison in Springfield, Vermont. (*Id.* at 11, ¶ 41.) At SSCF, Hutt was under the medical care of Defendants CCS and CCS employees Doctors Michael Rapaport and Mitchell Miller. (*Id.*) Pallito had contracted with CCS "to provide comprehensive health care to Vermont inmates in Vermont." (*Id.* at 5, ¶ 9.) Plaintiff alleges that CCS—like CCA—had a "corporate mission to reduce costs." (*Id.* at 13, ¶ 50.)

8

Plaintiff claims that, while at SSCF, Hutt's "tolerance of and reaction to the chemotherapy" was not properly monitored, thereby causing his feet to become inflamed and infected.  (*Id.* at 12, ¶ 43.)  Also according to Plaintiff, Hutt was removed from his "pain medication without a valid cause or justification."  (*Id.* at 12, ¶ 44.)  And Hutt was also not provided with "pain medication as prescribed by his treating physicians at [Dartmouth Hitchcock Medical Center]," but instead received a "less effective medication."  (*Id.* at 12, ¶ 45.)

On August 13, 2014, Hutt was released to the DOC's Field Supervision Unit. (*Id.* at 3, ¶ 4.)  He lived with his sister at her Windsor, Vermont residence until his death on October 27, 2014.  (*Id.* at 3–4, ¶ 4.)  Hutt's "cause of death" was osteosarcoma. (*Id.* at 8, ¶ 23.)

## Analysis

### I.    Rule 12(b)(6) Standard

"To survive a 12(b)(6) motion to dismiss, a 'complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Drimal v. Tai*, 786 F.3d 219, 223 (2d Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also* Fed. R. Civ. P. 8(a)(2).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 566 (2007)).

The plausibility standard "creates a 'two-pronged approach,' based on '[t]wo working principles.'" *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) (alteration in original) (citation omitted) (quoting *Iqbal*, 556 U.S. at 678). "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.[6] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## II.    Eleventh Amendment

Defendant Pallito asserts that, to the extent Plaintiff seeks damages from him in his official capacity, such a claim is barred under the Eleventh Amendment. (Doc. 71 at 4.) Pallito's official-capacity immunity from damages claims in federal court is well established. *E.g.*, *Thompson v. Pallito*, 949 F. Supp. 2d 558, 571–72 (D. Vt. 2013) (discussing Eleventh Amendment sovereign immunity). It is not clear from the Second Amended Complaint if Plaintiff has brought an official-capacity claim against Defendant Pallito. At the hearing on this Motion, Plaintiff's counsel stated that no official-capacity

---

[6]  In addition to accepting as true all of the factual allegations in a complaint, the Court may also consider matters that may be judicially noticed. *See Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 202 (2d Cir. 2014) (per curiam).

claim has been brought against Defendant Pallito.  In fact, in her Response to the Motion to Dismiss, Plaintiff states this aspect of the Motion to Dismiss "is not contested." (Doc. 75 at 2.)  Accordingly, I recommend that Plaintiff's damages claims against Defendant Pallito in his official capacity be DISMISSED.

## III.   Personal Involvement

Defendant Pallito argues that Plaintiff's constitutional claims against him should be dismissed because "Plaintiff makes only conclusory allegations" that Pallito was personally involved in any of the conduct for which Plaintiff seeks redress.  (Doc. 71 at 5.)  More specifically, Pallito contends that Plaintiff has failed to allege that he "created any policy or custom under which the alleged unconstitutional practices occurred."  (*Id.* at 7.)  Plaintiff maintains that Pallito was personally involved in the alleged constitutional violations because he "adopted a policy regarding the medical treatment of inmates that lead [sic] to the pervasive infringement of inmates' constitutional rights as protected by the Eighth and Fourteenth Amendments and Vermont law."  (Doc. 75 at 2; *see also id.* at 4–11.)  Plaintiff claims that Pallito was personally involved in creating DOC's "policy of sending Vermont inmates to third-party medical providers who were widely known to violate inmates' constitutional rights[,] causing serious injury and death."  (*Id.* at 3.)  Generally, Plaintiff argues that Pallito "made a series of health care decisions for Vermont inmates in order to [s]ave taxpayer dollars to the detriment of inmates under his care."  (*Id.*)

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal

involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*,

720 F.3d 133, 138 (2d Cir. 2013).  The Second Circuit has held that

> [t]he personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[7]  "While liability may not be

established against a defendant simply because that defendant was a 'policy maker' at the

time unconstitutional acts were committed, where unconstitutional acts are *the result* of a

policy promulgated by the defendant, a valid § 1983 action may lie."  *Brock v. Wright*,

315 F.3d 158, 165–66 (2d Cir. 2003) (citation omitted).

Here, the Second Amended Complaint does not include a particularly detailed

account of Pallito's decision-making process or policies.  Nevertheless, I conclude that

Plaintiff has alleged enough to establish Pallito's personal involvement insofar as

Plaintiff has alleged that Pallito failed to set adequate standards for selecting and

monitoring DOC contractors.  Pallito does not appear to dispute that he had authority to

select contractors for the DOC.  *See* Vt. Stat. Ann. tit. 28, § 102(b)(11) (charging

---

[7]  The Second Circuit has recognized that "the Supreme Court's decision in *Ashcroft v. Iqbal* . . . may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," but has not affirmatively decided *Iqbal*'s impact on *Colon*.  *Grullon*, 720 F.3d at 139.  Absent a Second Circuit decision specifically overruling *Colon*, this Court has continued to treat *Colon* as good law.  *See Jones v. Pallito*, No. 2:14-cv-199, 2015 WL 2376347, at *5 n.9 (D. Vt. May 18, 2015).

Commissioner with the power "[t]o contract for services . . . to carry out the functions of the Department"). Nor is there any dispute that Pallito is charged with the power to establish "programs and policies . . . for the correctional treatment of persons committed to the custody of the Commissioner." *Id.* § 102(b)(2).

According to the Second Amended Complaint, Pallito failed to properly investigate CCA and CCS before entering into contracts with them (*see* Doc. 61 at 2), and further failed to establish an auditing or quality-assurance policy to ensure that CCA and CCS were delivering health care in accordance with the contract and with Vermont law (*see id.* at 7, ¶ 18). The Court accepts the "veracity" of these allegations, *see Iqbal*, 556 U.S. at 679, concluding that Plaintiff has presented a plausible claim of Pallito's personal involvement under *Colon*'s third factor.[8]

Of course, concluding that Plaintiff has sufficiently alleged personal involvement under the third *Colon* factor says nothing about whether there *was* a constitutional violation, only that Plaintiff has adequately stated Pallito's personal involvement in the *alleged* constitutional violation. Indeed, Pallito contends that Plaintiff has not stated a plausible claim of any constitutional violation. (Doc. 71 at 7, 9.) I address that contention below.

---

[8] Plaintiff also alleges Pallito's personal involvement under the second, fourth, and fifth *Colon* factors. (Doc. 89 at 10–11.) However, Plaintiff has provided no substantive analysis of *Colon*'s second factor (*see id.*), and Plaintiff's Second Amended Complaint is devoid of sufficient factual allegations to support reliance on *Colon*'s fourth and fifth factors. In addition, at oral argument on Defendant Pallito's Motion to Dismiss, Plaintiff cited three cases to support her personal-involvement argument under the fourth and fifth *Colon* factors: *Cano v. City of New York*, 44 F. Supp. 3d 324 (E.D.N.Y. 2014); *Langley v. Coughlin*, 709 F. Supp. 482 (S.D.N.Y. 1989); and *Perri v. Coughlin*, No. 90–CV–1160, 1999 WL 395374 (N.D.N.Y June 11, 1999). (At the oral argument on the Motion to Dismiss, Plaintiff provided the Court with a citation for a 2014 *Perri* case. The Court assumes Plaintiff intended to cite the 1999 case.) Finding *Cano*, *Langley*, and *Perri* of little aid, the Court declines to rely on those cases.

**IV.     Whether Plaintiff has Failed to State a Constitutional Claim Against Pallito**

     **A.     Fifth Amendment**

Plaintiff's Second Amended Complaint alleges violations of Hutt's rights under the Fifth, Eighth, and Fourteenth Amendments.  (*See* Doc. 61 at 13–14 (Counts 1–3).) In her Response, however, Plaintiff concedes that no Fifth Amendment violation is alleged in this case.  (Doc. 75 at 17.)  Accordingly, I recommend that the Fifth Amendment claim be DISMISSED.

     **B.     Fourteenth Amendment—Equal Protection**

Count Three of the Second Amended Complaint alleges that Pallito violated Hutt's "right to Equal Protection of the laws under the Fourteenth Amendment to the Constitution of the United States of America by denying him his most basic right to medical care and subjecting him to inadequate treatment which, upon information and belief, differs from treatment accorded to similarly situated citizens."  (Doc. 61 at 14, ¶ 62.)  Defendant Pallito asserts that Plaintiff has failed to allege any facts suggesting that Hutt's medical treatment was different from others similarly situated.  (Doc. 71 at 9.) Plaintiff's Response mentions equal protection only in passing (*see* Doc. 75 at 4), and includes no substantive analysis on the issue.

"In order for a prisoner to state a violation of the Fourteenth Amendment Equal Protection Clause, he 'must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.'"  *Davis v. Pallito*, Civil Action No. 5:10-CV-154, 2011 WL 4443026, at *11 (D. Vt. June 16, 2011) (quoting *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005)).  "He must also show that

14

the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that this treatment was not reasonably related to any legitimate penological interests." *Id.* (quoting *Phillips*, 408 F.3d at 129).

Here, Plaintiff makes only the bald assertion that his medical treatment was different than that of others similarly situated. That is the sort of "recital[] of the elements of a cause of action" that is insufficient under the Rule 12(b)(6) standard. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (citing *Twombly*, 550 U.S. at 555)). At oral argument on this Motion, counsel for Plaintiff acknowledged that this claim was "weak." The Second Amended Complaint contains no factual allegations concerning the basis of the alleged discrimination, how other inmates were treated, or whether the alleged disparity in treatment was unrelated to legitimate penological objectives. Accordingly, Plaintiff has failed to state a claim under the Equal Protection Clause of the Fourteenth Amendment, and I recommend that the equal-protection claim be DISMISSED.

### C.     Fourteenth Amendment—Deliberate Indifference to Medical Care

Plaintiff alleges that Defendants violated Hutt's constitutional rights under the Fourteenth Amendment "by denying him his most fundamental right to life and engaging in outrageous conduct by their above[-]described actions." (Doc. 61 at 14, ¶ 58.) Defendant Pallito argues that this claim fails because the claim is "[']rooted in the Eighth Amendment['] and may not be alleged under a generalized theory of due process."

(Doc. 71 at 9 (quoting *Patient A v. State of Vermont*, No. 5:14-cv-000206, 2015 WL 589367, at *3 (D. Vt. Feb. 11, 2015).)

To the extent that Plaintiff is advancing a deliberate-indifference-to-medical-needs claim based on the Due Process Clause of the Fourteenth Amendment, I note that the standard is the same for such claims under the Eighth Amendment.  *See Nielsen v. Rabin*, 746 F.3d 58, 63 n.3 (2d Cir. 2014) (stating "distinction is not material because '[c]laims for deliberate indifference . . . should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment'" (alterations in original) (quoting *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009))).  Here, the Eighth Amendment offers the "explicit textual source" for the analysis of Plaintiff's deliberate-indifference claim.  *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989))).  Accordingly, Plaintiff's due process claim is, in fact, a claim arising out of the Eighth Amendment and should be analyzed under the Eighth Amendment.

Plaintiff does not address this argument directly.  (*See* Doc. 80 at 6.)  Neither in her Response (Doc. 75) nor in her Supplemental Memorandum (Doc. 89) does she refute Pallito's argument that the Eighth Amendment provides the proper constitutional analysis for Plaintiff's allegation in Count Two.  In support of her due process claim, Plaintiff provides citations to numerous cases from other circuits, all of which were decided before

*Graham* and *Albright*.  *See Graham*, 490 U.S. at 394–95 (holding excessive-force claims

should be analyzed under Fourth Amendment, "not the more generalized notion of

'substantive due process'"); *see also Albright*, 510 U.S. at 273 (expanding on *Graham*

holding and applying it to constitutional claims generally).  (*See* Doc. 80 at 6; Doc. 75

at 15, 16.)[9]

For these reasons, Plaintiff's due process claim under the Fourteenth Amendment

should be DISMISSED.

### D.    Eighth Amendment

The Eighth Amendment "forbids 'deliberate indifference to serious medical needs

of prisoners.'"  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir.

2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).[10]  "[T]he deliberate

indifference standard embodies both an objective and a subjective prong."  *Hathaway v.

Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  "The objective component requires that 'the

alleged deprivation must be sufficiently serious, in the sense that a condition of urgency,

one that may produce death, degeneration, or extreme pain exists.'"  *Hill v. Curcione*,

657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway*, 99 F.3d at 553).

"The second requirement is subjective: the charged officials must be subjectively

reckless in their denial of medical care," meaning that they acted or failed to act "'while

---

[9]  As Pallito notes, the two other cases that Plaintiff cites are simply irrelevant to her due process claim.  *Davis v. Pallito* involved an equal-protection challenge, not the Due Process Clause of the Fourteenth Amendment.  Civil Action No. 5:10–CV–154, 2011 WL 4443026, at *11 (D. Vt. June 16, 2011).  Likewise, *DeShaney v. Winnebego County Department of Social Services*, 489 U.S. 189 (1989), presented an entirely different issue: the state's responsibility to act with regard to child abuse prevention, not the state's obligation regarding inmates under the Fourteenth Amendment.  *Id.* at 191.

[10]  For state prisoners, the Eighth Amendment is applied to the states through the Fourteenth Amendment.  *See Caiozzo v. Koreman*, 581 F.3d 63, 69 n.3 (2d Cir. 2009).

*actually aware* of a substantial risk that serious inmate harm will result.'"  *Spavone*, 719 F.3d at 138 (quoting *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006)).  That mental state exists when a "prison official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  *Hathaway*, 99 F.3d at 553 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  "[T]he subjective element of deliberate indifference 'entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'"  *Id.* (second and third alterations in original) (quoting *Farmer*, 511 U.S. at 835).

Plaintiff alleges that Pallito violated Hutt's right under the Eighth Amendment to be free from cruel and unusual punishment.  (Doc. 61 at 13, ¶ 55.)  In particular, she states that Pallito exhibited acts "consisting of deliberate indifference and inattention to his serious medical needs and subjecting him to conditions that caused him extreme pain and suffering, exacerbated his medical condition, and caused his death."  *Id.*  Pallito argues that Plaintiff has advanced no allegations that he had "a sufficiently culpable state of mind such as deliberate indifference, much less any direct knowledge of Plaintiff or his treatment."  (Doc. 71 at 8.)

As noted above, "[w]hile liability may not be established against a defendant simply because that defendant was a 'policy maker' at the time unconstitutional acts were committed, where unconstitutional acts are *the result* of a policy promulgated by the defendant, a valid § 1983 action may lie."  *Brock*, 315 F.3d at 165–66 (citation omitted).

Where a policy is "deliberately indifferent" to a prisoner's "receiving necessary medical care," then "[s]uch a choice violates the Eighth Amendment." *Id.* at 167. The "policy" decisions at issue here are Pallito's decisions to enter into contracts with CCA and CCS, and his alleged failure to monitor (or have in place a procedure to monitor) the quality of the medical care delivered by CCA and CCS.

The authorities cited by the parties do not directly address the question of whether an official's decision to contract with a certain company could itself be deliberately indifferent to a prisoner's receiving necessary medical care. The parties also do not cite much authority on the question of an official's failure to monitor the quality of the services delivered by the selected contractor.[11] However, I conclude that *Smith v. District of Columbia*, 413 F.3d 86 (D.C. Cir. 2005), is instructive on both points.

In *Smith*, the District of Columbia contracted with a provider—Education Solutions Academy (ESA)—to run the District's independent living program for delinquent youths. *Smith*, 413 F.3d at 91. ESA had been formed recently by an individual who apparently had no experience with independent living programs. *Id.* at 90. The apartment complex that ESA had selected for its program had no locks or security cameras on the main doors, low lighting, and, according to one expert, had been an "open air drug market for at least 15 years." *Id.* In selecting the apartment complex, ESA managers asked no questions about safety or security, and failed to inform the

---

[11]  At the oral argument on this Motion, Plaintiff cited *Cano*, *Langley*, and *Perri* as relevant to this question, but *Cano*, *Langley*, and *Perri* do not involve contractors or an official's failure to monitor the quality of services provided by contractors. *See Cano v. City of New York*, 44 F. Supp. 3d 324 (E.D.N.Y. 2014); *Langley v. Coughlin*, 709 F. Supp. 482 (S.D.N.Y. 1989); *Perri v. Coughlin*, No. 90–CV–1160, 1999 WL 395374 (N.D.N.Y June 11, 1999).

apartment manager that they planned to place adjudicated delinquent youths there. *Id.*
ESA also did not have a license to operate an independent living program involving
minors. *Id.*

At the time it entered into a contract with ESA, the District had not developed any
criteria for evaluating contractors to run independent living programs. *Id.* Thus, the
District entered into the contract without asking ESA's managers whether they had prior
experience with independent living programs, whether ESA had a license to operate such
a program, and without inquiring about safety or security at the apartment complex that
ESA had selected. *Id.* at 90–91. After securing the contract, ESA failed to enforce
curfew in numerous instances, had at least two staff members with apparent connections
to illegal drugs, and failed to monitor the crime rate at the apartment complex, which
included several recent assaults and robberies involving firearms. *Id.* at 91–92. For its
part, the District "did little to monitor ESA's problems," having failed to look into
whether ESA was tracking site safety, failed to hold ESA to any staffing standards, and
taken "no noteworthy steps in response to two violent assaults on ESA youths," including
one murder in February 1999. *Id.* at 92.

In April 1999, in violation of curfew, one of the youths in the ESA program let a
visitor into an apartment; the visitor shot and killed both youths in the apartment. *Id.*
The grandmother of one of the murdered youths sued the District, alleging among other
things that the District had violated her grandson's substantive due process rights "by
virtue of its deliberate indifference in selecting and monitoring the program provider."
*Id.* at 89. The jury found the District liable and awarded $72,000 in damages. *Id.* The

Court of Appeals affirmed, holding that the District's "lack of standards" for selecting and monitoring providers to run its independent living program "amounted to a policy of deliberate indifference." *Id.* at 98.  The court reasoned that, from the evidence in the case, "the jury could have reasonably concluded that 'the need for more or different' standards for selecting and monitoring independent living programs for juvenile delinquents was 'so obvious and the inadequacy so likely to result in the violation of constitutional rights' that it constituted a deliberately indifferent city policy or custom." *Id.* at 100 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)).

The plaintiff in *Smith* brought a substantive due process claim (not an Eighth Amendment claim), but the analysis is nevertheless useful here.[12]  *Smith* suggests that an official who is responsible for setting standards for selecting and monitoring contractors and who fails to do so might be liable to the extent that the need for more or different standards is obvious and the inadequacy is likely to result in a violation of constitutional rights.[13]  If that is the test, however, Plaintiff's Second Amended Complaint fails to state a plausible claim.

Here, the allegations in the Second Amended Complaint are insufficient for the court to draw a reasonable inference that Pallito is liable for the misconduct alleged.

---

[12]  As noted above, the deliberate-indifference standard is the same under both the Eighth and Fourteenth Amendments.

[13]  The plaintiff in *Smith* had sued the District's Youth Services Administrator, but the jury did not find the administrator liable.  *Id.* at 102.  The D.C. Circuit concluded that there was no inconsistency in the verdict that held the District liable but not the administrator, reasoning that the jury could have found that the administrator was relatively new to her job, and that other juvenile facilities occupied most of her time.  *Id.*  Thus the *Smith* appeal did not directly involve any determination about a *policymaker's* liability as opposed to institutional liability.  I nevertheless find it instructive with respect to Plaintiff's claims against Pallito in his individual capacity.

Plaintiff's assertion that Pallito "failed to properly investigate and vet" CCA and CCS before contracting with them is insufficient to establish a plausible Eighth-Amendment claim.  (Doc. 61 at 2.)  The Second Amended Complaint includes no allegations regarding what process Pallito used to select CCA and CCS.  Plaintiff does not allege, for example, whether there was a bidding process as contemplated by Bulletin No. 3.5.  If Plaintiff's case were to approach the level of misconduct in *Smith*, Plaintiff would have to affirmatively allege that Pallito failed to have *any* criteria for selecting CCA and CCS.

Plaintiff's allegations regarding the publicized reports of CCA failing to provide safe housing and medically appropriate care to inmates are similarly unavailing.  Plaintiff cites no authority requiring state corrections departments to contract only with corrections companies with clear records of satisfactory contractual performance.  And even assuming that some contractors' records of performance could be so abysmal that selecting them to provide services might amount to deliberate indifference, Plaintiff's Second Amended Complaint does not allege such a circumstance.  The 2004 reports that Plaintiff mentions in her Response predate the DOC's contract with CCA and say almost nothing about CCA's performance as a provider of medical care.  For all the above reasons, I conclude that Plaintiff has failed to state a plausible claim that Pallito's standards for selecting CCA and CCS were obviously inadequate and likely to result in violations of constitutional rights.

Plaintiff's claim that Pallito failed to monitor (or have in place a procedure to monitor) the quality of the medical care delivered by CCA and CCS is similarly conclusory in the context of a deliberate-indifference claim.  The Second Amended

Complaint merely asserts that Pallito had no "established policy in effect" to ensure the contractors' compliance with the requisite standards of medical care. (*See* Doc. 61 at 7, ¶ 18.) That naked assertion fails to nudge Plaintiff's Eighth Amendment claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. For example, the Second Amended Complaint does not address whether the contracts with CCA and CCS included a contract management and monitoring process as contemplated by Bulletin No. 3.5.

In her Response, Plaintiff appears to acknowledge that DOC did in fact have a "Quality Oversight" process, citing a 2009 RFP issued by the DOC. (Doc. 75 at 9–10.) In light of that concession, Plaintiff's position appears to have shifted to the assertion that Pallito "took no discernable steps to enforce such a policy." (*Id.* at 10.) But that allegation, too, is entirely conclusory. The Second Amended Complaint alleges no details regarding what specific steps Pallito took (or failed to take) to monitor the medical contractors' performance.

At best, Plaintiff cites to a 2014 interview Pallito gave where he remarked that it was difficult to perform surprise on-site inspections at CCA facilities: "[A]nybody we deal with is going to know we're coming. . . . It's hard to just show up." (Doc. 75 at 4 (quoting Mark Davis, *Fracas in Arizona Prison Leads to Lockdown for Vermont Inmates*, Seven Days (Oct. 1, 2014), http://www.sevendaysvt.com/vermont/fracas-in-arizona-prison-leads-to-lockdown-for-vermont-inmates/Content?oid=2449326).)[14] But even if it

---

[14] The Court may take judicial notice of the fact that the Seven Days report contained the quotation attributed to Pallito. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents . . . .").

was impossible for DOC staff to conduct surprise inspections at CCA facilities, that does not mean that it was impossible to enforce a contract-monitoring system. And Plaintiff has failed to allege any other facts that would allow the Court to reasonably infer that Pallito failed to enforce the "Quality Oversight" process that was in place. Thus, for the above reasons, I conclude that Plaintiff has failed to state a plausible claim that Pallito's standards for monitoring CCA and CCS were obviously inadequate and likely to result in violations of constitutional rights. Accordingly, I conclude that Plaintiff has failed to state a plausible deliberate-indifference claim, and I recommend that the deliberate-indifference claim be DISMISSED.

## V.    State-Law Claims—Vermont Tort Claims Act and Absolute Immunity

Plaintiff asserts a variety of state-law claims against Pallito: negligent hiring, training, and supervision (Count Four); negligent medical care and treatment (Count Five); gross negligence (Count Six); negligence (Count Nine); and wrongful death (Count Ten).[15] (Doc. 61 at 15–19.) Pallito asserts that all of those claims against him should be dismissed because they are precluded by the Vermont Tort Claims Act (VTCA) and because he enjoys absolute immunity from tort liability. (Doc. 71 at 10.) Plaintiff argues that under the VTCA state officials can be liable for gross negligence or willful misconduct. (Doc. 75 at 12.) Plaintiff also maintains that Pallito "is not entitled to . . . immunity because he was personally involved in the Department of Corrections['s]

---

[15] Count Eight in Plaintiff's Second Amended Complaint alleged Defendant Pallito's involvement in the medical-malpractice claim. (Doc. 61 at 17.) At oral argument, Plaintiff's counsel agreed that Pallito should not have been included in Count Eight.

policy of sending Vermont inmates to third-party medical providers who were widely known to violate inmates' constitutional rights causing serious injury and death." (*Id.* at 3.)

### A.    Sovereign Immunity and the VTCA

"The VTCA constitutes only a limited waiver of Vermont's sovereign immunity; it allows lawsuits resulting from state employee torts to be brought '(1) solely against the State of Vermont and (2) exclusively in Vermont superior courts.'" *Jones v. Pallito*, No. 2:14–cv–199, 2015 WL 2376347, at *10 (D. Vt. May 18, 2015) (quoting *Rheaume v. Tallon*, No. 1:07–cv–262, 2009 WL 385422, at *2 (D. Vt. Feb. 12, 2009), and citing Vt. Stat. Ann. tit. 12, §§ 5601(a), 5602(a)). Pallito does not argue that Plaintiff has brought her state-law claims against him in the wrong court (although that would be a powerful argument). Instead, Pallito contends that the VTCA requires those claims to be brought solely against the State of Vermont and prevents Plaintiff from bringing them against him personally. (Doc. 71 at 11.)

As the parties correctly point out, while the VTCA generally requires that actions against state employees be brought solely against the State of Vermont, there is an exception in cases of employees' "gross negligence or willful misconduct." Vt. Stat. Ann. tit. 12, § 5602(b). The parties disagree, however, as to whether Plaintiff has stated a plausible claim of gross negligence. Pallito maintains that the allegations in the Second Amended Complaint "simply do not rise to the level of gross negligence or willful misconduct." (Doc. 71 at 11.) Plaintiff insists that Pallito "utterly failed Mr. Hutt, not in an exercise of discretion, but because his standard operating procedure was to not act

when his chosen health care providers violated the constitutional rights of Vermont inmates."  (Doc. 75 at 12–13.)

I conclude that Plaintiff has failed to state a claim of gross negligence for largely the same reasons that Plaintiff has failed to state a deliberate-indifference claim.  Of course, just because Plaintiff has failed to state a plausible deliberate-indifference claim against Pallito does not necessarily mean that Plaintiff has failed to state a gross-negligence claim.  *See Doe v. New York City Dep't of Soc. Servs.*, 649 F.2d 134, 143 (2d Cir. 1981) (concepts of gross negligence and deliberate indifference are "not literally coextensive"); *Estate of Rodriguez v. Simon*, No. 2:06–CV–125, 2007 WL 2154238, at *6 (D. Vt. Mar. 30, 2007) ("[G]ross negligence is slightly closer to the negligence end of the spectrum than deliberate indifference."), *adopted* No. 2:06–CV–125 (D. Vt. July 19, 2007), ECF No. 49.  However, I conclude that Plaintiff's allegations do not bring this case within the ambit of even gross negligence.

"Gross negligence is a 'heedless and palpable violation of legal duty respecting the rights of others.'"  *Kane v. Lamothe*, 2007 VT 91, ¶ 12, 182 Vt. 241, 248, 936 A.2d 1303, 1309 (quoting *Shaw v. Moore*, 104 Vt. 529, 531, 162 A. 373, 374 (1932)).  "'[G]ross negligence is more than an error of judgment,' it is the failure to exercise 'even a slight degree of care' owed to another."  *Id.* (alteration in original) (first quoting *Hardingham v. United Counseling Serv. of Bennington Cty., Inc.*, 164 Vt. 478, 481, 672 A.2d 480, 482 (1995); then quoting *Mellin v. Flood Brook Union Sch. Dist.*, 173 Vt. 202, 220, 790 A.2d 408, 423 (2001)).  Plaintiff's allegations are insufficient to reasonably conclude that Pallito committed a "'heedless and palpable violation of legal duty,'" *see id.* (quoting

*Shaw*, 104 Vt. at 531, 162 A. at 374), and that the need for more or different standards for selecting and monitoring CCA and CCS was "so obvious that it should be known," *see Rodriguez*, 2007 WL 2154238, at *6 (quoting *Farmer*, 511 U.S. at 836) ("[T]he Supreme Court rejected the civil-law recklessness standard for deliberate indifference, which suggests gross negligence is slightly closer to the negligence end of the spectrum than deliberate indifference because it imputes knowledge on a prison official where the risk is 'so obvious that it should be known' . . . ." (quoting *Farmer*, 511 U.S. at 836)). Accordingly, the gross-negligence exception does not apply.

### B.    Absolute Official Immunity

Plaintiff's state-law claims against Pallito are also barred by absolute official immunity.[16]  As this Court has noted, "[a]bsolute immunity applies to judges, legislators[,] and *the state's highest executive officers* when they are acting within their respective authorities." *Brady v. Pallito*, No. 5:12–cv–41, 2013 WL 2632780, at *4 (D. Vt. June 11, 2013) (alterations in original) (quoting *LaShay v. Dep't of Soc. & Rehab. Servs.*, 160 Vt. 60, 64, 625 A.2d 224, 227 (1993)).  "The Vermont Supreme Court has held that the Commissioner of Corrections is among Vermont's 'highest executive officers' for immunity purposes, and thus is protected by absolute immunity so long as the acts attributed to him are within the 'the scope of [his] authority.'" *Id.* (alteration in original) (quoting *Curran v. Marcille*, 152 Vt. 247, 249, 565 A.2d 1362, 1363 (1989)).

---

[16]  Plaintiff references "qualified immunity" in her Response (Doc. 75 at 3), but Pallito does not rely on that doctrine, presumably because it generally applies to "lower level" state officers.  *See O'Connor v. Donovan*, 2012 VT 27, ¶ 6, 191 Vt. 412, 48 A.3d 584 (comparing the two degrees of official immunity).

Here, Plaintiff's allegations do not suggest that any of Pallito's acts or alleged omissions regarding the selection and monitoring of CCA and CCS were outside the scope of his authority as Commissioner.  Plaintiff cites no support for her assertion that Pallito's personal involvement in the alleged violations overcomes absolute immunity. (*See* Doc. 75 at 3.)  Those issues are distinct; alleging personal involvement does not defeat absolute immunity.  *See Allen v. City of New York*, No. 12–CV–4961 (KAM)(LB), 2014 WL 4258529, at *4 (E.D.N.Y. Aug. 27, 2014) ("Even assuming, *arguendo,* that Plaintiff's conclusory allegations regarding Donovan's personal involvement in his prosecution sufficiently pleads Donovan's direct involvement in the alleged constitutional deprivation, Plaintiff fails to overcome Donovan's entitlement to absolute immunity.").[17]  Accordingly, Pallito's absolute official immunity bars Plaintiff's claims against him in this case.

## Conclusion

For the reasons discussed above, I recommend that Defendant Pallito's Motion to Dismiss (Doc. 71) be GRANTED.

Dated at Burlington, in the District of Vermont, this 17th day of November, 2015.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

---

[17]  To the extent that Plaintiff might be asserting that Pallito had a malicious motive or intent, that is irrelevant to absolute immunity.  *See O'Connor*, 2012 VT 27, ¶ 6 n.2.

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).