UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Melissa Dumont, as Personal Representative
for the Estate of Robert Donald Hutt,

      Plaintiff,

      v.                                   Civil Action No. 2:14-cv-209-cr-jmc

Corrections Corporation of America,
Correct Care Solutions, LLC,
Michael E. Rapaport, Mitchell Miller,
and Andrew Pallito,

      Defendants.

## <u>REPORT AND RECOMMENDATION</u>
(Doc. 117)

      Plaintiff Melissa Dumont, as Personal Representative for the Estate of Robert

Donald Hutt, brings this action under 42 U.S.C. § 1983 and Vermont tort law for alleged

unconstitutional and negligent conduct relating to Hutt's medical care while he was in the

custody of the Vermont Department of Corrections (DOC) in her Third Amended

Complaint (TAC).  (Doc. 108.)  For relief, Plaintiff seeks damages in excess of

$20 million.  (*Id.* at 19.)  Pending before the court is Defendant Andrew Pallito's Motion

to Dismiss Plaintiff's TAC.  (Doc. 117.)

      The procedural history in this matter is lengthy, and the court has previously

issued numerous Reports and Recommendations and Opinions and Orders.  (*See, e.g.*,

Docs. 63, 68, 91, 104, 122.)  Given the extent of the procedural developments in this case, I begin with a discussion of the relevant procedural background.

Plaintiff filed a Second Amended Complaint (SAC) on April 9, 2015 (Doc. 61), naming the following Defendants: Corrections Corporation of America (CCA), a corporation that houses Vermont inmates in its facilities out of state (*id.* at 4, ¶ 5; 6, ¶ 14); CCA employees Keith Ivens, Iman Gonzalez, RN-BSN, and Teresa Lanier, MD, PhD (*id.* at 4–5, ¶¶ 6–8); Correct Care Solutions (CCS), a limited liability company that contracted with the DOC to provide health care to Vermont inmates (*id.* at 5, ¶ 9); Drs. Michael Rapaport and Mitchell Miller, employees of CCS and Hutt's physicians (*id.* at 5, ¶¶ 10–11; 11, ¶ 41); and former DOC Commissioner Andrew Pallito (*id.* at 5–6, ¶¶ 12–13).

This court dismissed Plaintiff's claims against Defendants Ivens, Gonzalez, and Lanier for lack of personal jurisdiction.  (Doc. 63; *see also* Doc. 68 (adopting Report and Recommendation).)  Subsequently, the court granted Pallito's Motion to Dismiss the SAC, finding that: Plaintiff's claims against Pallito in his official capacity were barred by sovereign immunity; Plaintiff had not sufficiently alleged Pallito's personal involvement in the alleged constitutional violations and had failed to state a claim under the Eighth, Fifth, and Fourteenth Amendments; and Plaintiff's state law claims were barred by the Vermont Tort Claims Act (VTCA) and by Pallito's absolute immunity.  (*See* Doc. 91; *see also* Doc. 109 (adopting Report and Recommendation).)  The court also granted CCA's Motion to Sever (Doc. 83), transferring Plaintiff's claims against CCA to the District of Arizona.  (*See* Doc. 104; *see also* Doc. 122 (adopting Report and Recommendation).)

On March 8, 2016, after being granted leave to amend, Plaintiff filed her TAC. (Doc. 108.)  The vast majority of the allegations contained in the TAC mirror those contained in the SAC.[1]  In fact, despite the court's dismissal of Plaintiff's Eighth Amendment claims and state law claims (negligent medical care and treatment, gross negligence, medical malpractice, negligence, and wrongful death, among others) against Pallito alleged in the SAC (*see* Doc. 91), these claims are again asserted in the TAC (Doc. 108).

Pallito now moves to dismiss the TAC pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that: (1) the Complaint fails to sufficiently allege that Pallito was personally involved in the alleged constitutional violations or was deliberately indifferent to Plaintiff's care; (2) Plaintiff has failed to state a claim under the Eighth Amendment; and (3) Plaintiff's state law claims are barred by the VTCA and by Pallito's absolute official immunity.  (Doc. 117 at 1, 10.)  Plaintiff filed an Opposition to Pallito's Motion to Dismiss (Doc. 124), and Pallito filed a Reply thereto (Doc. 132).

On August 10, 2016, the parties filed a "Stipulation to Dismiss with Prejudice Specific Claims Against Defendant Andrew Pallito" (Stipulated Dismissal), under

---

[1]  The only major differences between Plaintiff's SAC and TAC are the removal of the individual Arizona plaintiffs, who have been dismissed from this case for lack of personal jurisdiction (Doc. 63; *see also* Doc. 68 (adopting Report and Recommendation)), and additional allegations that Pallito is liable for his failure to oversee contracts with CCA and CCS.  (*See, e.g.*, Doc. 108 at 2.)  However, all claims against Pallito arising out of Hutt's treatment by CCA have been dismissed as a result of the parties' "Stipulation to Dismiss with Prejudice Specific Claims Against Defendant Andrew Pallito," as discussed below. (Doc. 130; *see also* Doc. 108 at ¶¶ 6, 11–12, 14–17, 22–23, 28, 35, 41–44, 47–48, 86 (claims that have been dismissed under the Stipulated Dismissal). )  Nevertheless, I proceed with a brief discussion of Plaintiff's allegations.  For a full discussion of the factual background in this case, see Doc. 91 at 2–9.

Federal Rule of Civil Procedure 41(a)(1)(A)(ii).[2]  (Doc. 130.)  Therein, the parties agreed

to the dismissal of Plaintiff's claims against Pallito, "to the extent they arise out of

Decedent Robert Hutt's incarceration at . . . [CCA's] Florence Correctional Center in

Florence, Arizona."  (*Id.* at 1.)  Relevant to Pallito's pending Motion to Dismiss,

however, the parties agreed that "Plaintiff's claims against Andrew Pallito arising out of

Hutt's incarceration at the Southern State Correctional Facility in Springfield,

Vermont . . . remain active in this lawsuit at this time."  (*Id.*)

For the reasons discussed below, I recommend that Pallito's Motion to Dismiss

(Doc. 117) be GRANTED.

## Background

For the purpose of deciding Pallito's Motion, the court accepts as true all factual

allegations contained in Plaintiff's TAC, as summarized below.  *See Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).

As an initial matter, the TAC alleges that Pallito entered into a contract on behalf

of the DOC with CCA.  (Doc. 108 at 5–6, ¶ 12.)  The court, however, has struggled to

confirm Plaintiff's factual allegations with regard to this contract.  In its previous Report

and Recommendations, because Plaintiff had not filed the contract itself, the court had to

refer to the prior Complaints for details about the terms of the contract.  (*See* Doc. 91 at 5

n.5.)  Plaintiff has now attached the contract to her redlined version of the TAC (*see*

---

[2]  Rule 41(a)(1)(A)(ii) allows a plaintiff to dismiss an action "without a court order[,] by filing . . . a stipulation of dismissal signed by all parties who have appeared."  Fed. R. Civ. P. 41(a)(1)(A)(ii).

Doc. 94-4), but the factual allegations contained in the TAC do not align with the terms of the contract.[3]  Due to this lack of clarity, the court does not accept any allegations that are contradicted by the terms of the contract.  *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) ("[W]here a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true.").

Robert Hutt was a Vermont inmate committed to Commissioner Pallito's custody. (Doc. 108 at 3–4, ¶ 4.)  In 2010, Pallito sent Hutt to CCA's facility in Florence, Arizona. (*Id.* at 6, ¶ 16.)  Beginning in February 2013, Hutt began to experience pain in his left hip.  (*Id.* at 7, ¶ 24.)  He complained repeatedly to CCA medical personnel, but they "ignored" Hutt's requests for treatment, did not investigate the source of his pain, and merely prescribed ibuprofen.  (*See id.*)  Had CCA ordered an X-ray or MRI of Hutt's left leg and hip, it would have revealed that Hutt had osteosarcoma (bone cancer).  (*See id.* at 8, ¶¶ 25–28.)

On November 27, 2013, Hutt's femur "snapped" while he was standing in his cell and he was transported to a hospital where he received emergency surgery.  (*Id.* at 9, ¶ 30.)  "According to the surgical records, the femur abnormalities were obvious on sight."  (*Id.* at 9, ¶ 31.)  Hutt was diagnosed with osteosarcoma on December 5, 2013 (*id.*

---

[3]  For example, the TAC alleges that Pallito contracted with CCA to house Vermont inmates in January 2007 and that this contract was subsequently amended in 2010.  (Doc. 108 at 5–6, ¶ 12.)  By contrast, the contract attached to the redlined version of the TAC appears to have been signed in June 2011, made effective in July 2011 (Doc. 94-4 at 1, 7, 9, 54), and amended in June 2013 (*id.* at 2). Additionally, the TAC alleges that the contract called for CCA to be paid "a daily rate of $62.17" (Doc. 108 at 5–6, ¶ 12), whereas the contract attached to the redlined TAC does not reflect this rate (*see* Doc. 94-4 at 11, 33).

at 9, ¶ 32), but CCA did not inform him of this diagnosis until over a month later on January 14, 2014 (*id.* at 9, ¶ 33).  CCA also delayed Hutt's treatment by failing to promptly authorize his chemotherapy regimen.  (*See id.* at 9, ¶¶ 34, 44).

Around December 3, 2013, Hutt returned to CCA's Florence facility confined to a wheelchair.  (*Id.* at 9, ¶ 36.)  His wheelchair would not fit inside his medical unit and he was forced to "choose between access to a bed [in the wheelchair-accessible general population] and IV medication," which he could not take outside of the medical unit.  (*Id.* at 10, ¶¶ 38–39.)  CCA medical staff did not reliably administer Hutt's prescribed pain medication or antibiotics.  (*Id.* at 10, ¶¶ 40–41.)  Hutt consequently "developed an infection [at] the surgical site."  (*Id.* at 10, ¶ 42.)  Additionally, Hutt was not provided with proper bedding (*id.* at 9–10, ¶ 37) or physical therapy after his surgery, and he developed deep vein thrombosis, requiring additional surgery (*id.* at 10–11, ¶ 43).

In March 2014, Hutt was transferred to Southern State Correctional Facility (SSCF)—a Vermont prison located in Springfield.  (*Id.* at 11–12, ¶ 49.)  At SSCF, Hutt was under the medical care of CCS and CCS employees Drs. Michael Rapaport and Mitchell Miller.  (*Id.*)  Pallito had contracted with CCS "to provide comprehensive health care to Vermont inmates in Vermont."  (*Id.* at 4, ¶ 7.)  CCS had a "corporate mission to reduce costs" (*id.* at 13, ¶ 60), and Pallito knew or should have known that "CCS provided substandard medical care to inmates in an effort to reduce costs" (*id.* at 6, ¶ 13).  Pallito "failed to properly investigate and vet the conditions to which Vermont inmates would be subjected." (*Id.* at 2.)  More specifically, Pallito did not monitor CCS's contract

compliance or oversee the medical care that CCS was providing to Hutt.  (*Id.* at 9, ¶ 35; 12, ¶ 50.)

At SSCF, Hutt's "tolerance of and reaction to the chemotherapy" was not properly monitored, thereby causing his feet to become inflamed and infected.  (*Id.* at 12, ¶ 52.) Hutt was provided with medication that was less effective than the pain medication that his treating physicians at Dartmouth Hitchcock Medical Center had prescribed (*id.* at 12, ¶ 54), and was taken off of pain medication "without a valid cause or justification" (*id.* at 12, ¶ 53).

On August 13, 2014, Hutt was released to the DOC's Field Supervision Unit.  (*Id.* at 3–4, ¶ 4.)  He lived with his sister at her Windsor, Vermont residence until his death on October 27, 2014.  (*Id.*)  Hutt's cause of death was osteosarcoma.  (*See id.* at 7–8, ¶ 24; 8, ¶ 28.)

## Analysis

### I.     Law of the Case

This court has already dismissed Plaintiff's claims against Pallito, raised again in the TAC.  (*See* Doc. 91.)  Plaintiff's claims are thus barred by the law of the case doctrine, which states: "[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  *Arizona v. California*, 460 U.S. 605, 618 (1983).  The doctrine "is implicated when a court reconsiders its own ruling on an issue in the absence of an intervening ruling on the issue by a higher court."  *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002).  The law of the case doctrine is discretionary and does not restrict the court's power, but rather

directs courts to follow prior decisions unless "cogent and compelling reasons militate otherwise." *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (quoting *Quintieri*, 306 F.3d at 1225); *see also Higgins v. Cal. Prune & Apricot Grower, Inc.*, 3 F.2d 896, 898 (2d Cir. 1924) (finding that the law of the case doctrine "does not rigidly bind a court to its former decisions, but is only addressed to its good sense").  Cogent and compelling reasons include "an intervening change in law, availability of new evidence, or 'the need to correct a clear error or prevent manifest injustice.'"  *Johnson*, 564 F.3d at 99–100 (quoting *Quintieri*, 306 F.3d at 1230).

The purpose of the law of the case doctrine is to "maintain consistency and avoid reconsideration of matters once decided during the course of a single lawsuit."  *Walsh v. McGee*, 918 F. Supp. 107, 111 (S.D.N.Y. 1996) (quoting 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4478, at 788 (1981)).  In short, it "promotes judicial economy by permitting a court to refuse to revisit an issue that the court already has decided."  *Weitzman v. Stein*, 908 F. Supp. 187, 193 (S.D.N.Y. 1995).

Here, Plaintiff again asserts violations of the Eighth Amendment and state law by Pallito—including negligent medical care and treatment, gross negligence, medical malpractice, negligence, and wrongful death—in her TAC.  (Doc. 108.)  These claims, among others, have already been dismissed by the court (Doc. 91; *see also* Doc. 109 (adopting Report and Recommendation))—a fact Plaintiff seems to ignore.  Moreover, Plaintiff's new complaint does not add any substance to the claims that have already been dismissed by the court.  (*See* Doc. 94-1 (tracking changes between Plaintiff's SAC and

TAC).)[4]  Furthermore, Plaintiff has not sought to amend her complaint to remove her claims that have been dismissed against Pallito, pursuant to the parties' Stipulated Dismissal (*see* Doc. 130), or to clarify the basis for her claims that remain.

Plaintiff makes only two allegations in her TAC that appear to be "new" and not disposed of in the Stipulated Dismissal.  Both of these allegations are reiterations of Plaintiff's claims against Pallito in her SAC: in sum, that Pallito should not have contracted with CCS in the first place, and that he failed to oversee the quality of services provided by these contractors.  First, Plaintiff argues that Pallito should not have contracted with CCS because he knew the contractor would not provide adequate medical services.  She alleges that Pallito "knew, or should have known that CCA and CCS provided substandard medical care to inmates in an effort to reduce costs, allowing the contract price to remain shockingly low."  (Doc. 108 at 6, ¶ 13.)  This contention appears to be a restatement of Plaintiff's allegation in her SAC that "Defendants CCA and CCS, as part of their corporate mission to reduce costs . . . had a policy, custom and practice that was deliberately indifferent to Mr. Hutt's Eighth Amendment Rights . . . ."  (Doc. 61 at 13, ¶ 50.)  Plaintiff also alleges that Pallito should not have entered into the contracts in the first place because of his involvement on a DOC taskforce that addressed contract oversight problems in a 2004 Vermont Auditor's Report.  (*See* Doc. 108 at 7, ¶ 20.)

Second, Plaintiff adds to her TAC that Pallito "failed to monitor contract compliance with Defendants . . . CCS, Miller[,] and Rapaport resulting in an environment

---

[4]  For example, many of the changes incorporated into Plaintiff's TAC are grammatical revisions, or deletions to reflect the court's dismissal of claims against CCA employees for lack of personal jurisdiction.  (*See, e.g.*, Doc. 94-1 at 4–5, 10–13 (tracking changes between Plaintiff' SAC and TAC).)

that permitted substandard medical treatment." (Doc. 108 at 12, ¶ 50; *see* also Doc. 61 at 14, ¶ 56). Specifically, she argues that Pallito did not oversee Hutt's medical treatment, including when he was in the care of the Vermont DOC. (*Id.* at 10, ¶ 35.) These contract oversight claims echo Plaintiff's allegations from her SAC that "Defendant Pallito did not have an established policy in effect to ensure that Mr. Hutt received health care in accordance with the prevailing standard of care . . . [,]" (Doc. 61 at 7, ¶ 18) and that he "further failed to insure that Vermont inmates in CCA facilities were treated in accordance with Vermont law" (*id.* at 2; *see also* Doc. 108 at 2).

The claims that Plaintiff restates in her TAC have already been dismissed by this court. (*See* Doc. 91 at 21–23.) In the November 2015 Report and Recommendation, the court held that "Plaintiff's assertion that Pallito 'failed to properly investigate and vet'" the contractors did not establish a plausible Eighth Amendment claim because the SAC did not include any detail as to the process Pallito used for selecting CCA and CCS. (*Id.* at 22 ("Plaintiff would have to affirmatively allege that Pallito failed to have *any* criteria for selecting CCA and CCS.").) The court also rejected Plaintiff's claims about Pallito's involvement in the 2004 Vermont Auditor's Report on contract oversight, stating: "The 2004 reports that Plaintiff mentions in her Response predate the DOC's contract with CCA and say almost nothing about CCA's performance as a provider of medical care." (*Id.*) Moreover, the court found that Plaintiff's allegations regarding publicized reports on the failings of CCA and other contractors to provide appropriate medical care to inmates were "similarly unavailing" because Plaintiff "cite[d] no authority requiring state corrections departments to contract only with corrections companies with clear records of

10

satisfactory contractual performance." (*Id.*)  Finally, the court held that Plaintiff's claim

that Pallito failed to monitor, or implement a procedure for monitoring, the quality of

medical care provided by CCA and CCS was a "naked assertion" that "fail[ed] to nudge

Plaintiff's Eighth Amendment claim 'across the line from conceivable to plausible.'"

(*Id.* at 23 (quoting *Twombly*, 550 U.S. at 570).)

      In her TAC, Plaintiff fails to bolster these allegations from her SAC with

additional details, evidentiary support, or citations to authority.  (*See* Doc. 108.)

Moreover, Hutt fails to point to a "cogent or compelling reason" for this court to revisit

its prior ruling.  The parties do not claim that there has been a change in the law, that new

evidence has come to light, or that revisiting Plaintiff's claims is necessary to correct a

clear error.  *See Johnson*, 564 F.3d at 99–100.  Rather, Pallito persuasively argues that

Plaintiff has added very little, if any, substance to her TAC.  (*See, e.g.*, Doc. 117 at 11

("Indeed, between the second and third iterations of h[er] amended complaint, Plaintiff

has added nothing to bolster [the contract] theory of liability."); *id.* at 17 ("The

Commissioner's arguments for dismissal and the Magistrate Judge's reasoning apply with

equal force to the TAC, which neither has added nor can add any allegations capable of

overcoming Commissioner Pallito's legal defenses [of Vermont Tort Claims Act

sovereign immunity and absolute immunity].").)  Plaintiff's insistence on filing the TAC

with nearly identical claims against Pallito to the claims that this court has already

dismissed is decidedly against judicial economy.  *See Weitzman*, 908 F. Supp. 187 at 194

("Far from promoting judicial economy, the instant motion has further prolonged and

complicated the instant litigation . . . .").

Therefore, the court need not yet again revisit the allegations against Pallito in Plaintiff's TAC because they are barred by the law of the case doctrine.  I thus recommend that the court DISMISS Plaintiff's claims against Pallito for the reasons stated in its November 17, 2015 Report and Recommendation.  (*See* Doc. 91; *see also* Doc. 109 (adopting Report and Recommendation).)

In the alternative, if the court decides to reevaluate Plaintiff's claims and consider the substantive claims in Pallito's pending Motion to Dismiss (Doc. 117), I recommend that the Motion be GRANTED without leave to amend.

## II.      Rule 12(b)(6) Standard

Pallito has filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Doc. 117.)  In order to survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678); *see also* Fed. R. Civ. P. 8(a)(2).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

Two principles guide a plausibility determination: first, though a court must accept as true all factual allegations in the complaint, this requirement "is inapplicable to legal conclusions."  *Id.* at 678.  "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555); *see also Turkmen v. Hasty*, 789 F.3d 218, 233 (2d Cir. 2015). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## III.   Commissioner Pallito's Personal Involvement

First, Pallito argues that Plaintiff's constitutional claims against him should be dismissed because Plaintiff cannot show that Pallito was personally involved in the alleged unconstitutional deprivation of care. (Doc. 117 at 4.) Specifically, Pallito asserts that "there is no allegation that Commissioner Pallito had any direct interaction with or even knowledge of Plaintiff," that he "created a policy or custom" fostering the unconstitutional acts, or that he was grossly negligent in supervising the subordinates who were responsible for the constitutional violations. (*Id.* at 4–7.) Plaintiff responds that this court's November 2015 Report and Recommendation (Doc. 91) "establishes Commissioner Pallito's plausible personal involvement" in the alleged constitutional violations. (Doc. 124 at 2.)

In order to recover damages on a § 1983 claim, a plaintiff must establish the personal involvement of the defendants in the alleged constitutional violations. *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013). The Second Circuit has held:

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[5]  Additionally, personal involvement "requires a showing of more than the linkage in the prison chain of command; the doctrine of respondeat superior does not apply." *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (per curiam) (citing *Williams v. Vincent*, 508 F.2d 541, 546 (2d Cir. 1974)).  Though a defendant cannot be found liable "simply because [he or she] was a 'policy maker' at the time unconstitutional acts were committed, . . . where unconstitutional acts are *the result* of a policy promulgated by the defendant, a valid § 1983 action may lie."  *Brock v. Wright*, 315 F.3d 158, 165–66 (2d Cir. 2003) (citation omitted).

In the November 2015 Report and Recommendation, the court found that while the Plaintiff's SAC had not "include[d] a particularly detailed account of Pallito's decision-making process or policies," Plaintiff had nevertheless "alleged enough to establish Pallito's personal involvement" under the third *Colon* factor.  (Doc. 91 at 12.)

---

[5]  In *Grullon v. City of New Haven*, 720 F.3d 133 (2d Cir. 2013), the Second Circuit recognized that "the Supreme Court's decision in *Ashcroft v. Iqbal* . . . may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations . . . ."  *Id.* at 139; *see also Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) (declining to decide the "contours of the supervisory liability test . . . after *Iqbal*").  Still, the Second Circuit has not specifically overruled *Colon*, and this court continues to treat it as good law.  *See, e.g.*, *Jones v. Pallito*, No. 2:14–cv–199, 2015 WL 2376347, at *5 n.9 (D. Vt. May 18, 2015).

The court based this conclusion on Plaintiff's allegations that Pallito had failed to properly investigate CCA and CCS before entering into contracts with them (Doc. 61 at 2) and had failed to establish a policy to ensure that CCA and CCS were delivering health care in accordance with the contracts and with Vermont law (*see id.* at 7, ¶ 18). To the extent that any of Plaintiff's claims against Pallito survive this court's dismissal of Plaintiff's SAC and the Stipulated Dismissal, as explained below, I now conclude Plaintiff has failed to make a plausible allegation of Pallito's personal involvement in the alleged constitutional violations.

Plaintiff does not appear to argue that under the first and second Colon factors Pallito was directly involved in the unconstitutional conduct, or was notified that it had occurred and failed to address the problem. Rather, the TAC indicates that Plaintiff seeks to hold Pallito responsible on the basis of the contractor's alleged wrongdoing. (*See, e.g.*, Doc. 108 at 12, ¶ 51 ("Defendant [CCS] provided day-to-day medical treatment on behalf of Defendant Pallito."); *see also id.* at 13, ¶ 56 (Pallito's alleged failure to oversee the CCS contract "allowed CCS, Miller[,] and Rap[a]port to deny crucial treatment without regard to oversight from Defendant Pallito").)

Plaintiff also has not sufficiently alleged a plausible claim that Pallito created a "policy or custom under which unconstitutional practices occurred" under the third *Colon* factor. A policy or custom can be explicitly established in an adopted rule or regulation, or may exist if the "violative practice is 'persistent and widespread,'" and if the acts of subordinate employees "imply the constructive acquiescence of senior policy-making

15

officials." *Lipton v. Cty. of Orange*, 315 F. Supp. 2d 434, 453 (S.D.N.Y. 2004) (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2nd Cir. 1992)) (describing the meaning of an unconstitutional policy or custom in the analogous municipal liability context); *see also Monell v. Dep't of Social Servs. of N.Y.C.*, 436 U.S. 658, 691 (1978).

For example, and most comparable to Plaintiff's case, in *Plair v. City of New York*, 789 F. Supp. 2d 459 (S.D.N.Y. 2011), a pretrial detainee claimed that supervisory defendants (including the commissioner of the New York City Department of Corrections) had "received extensive information concerning the City's pattern of incidents involving unnecessary and excessive force to inmates and the failure of the DOC to prohibit its staff from using such force . . . ." *Id.* at 466.  The defendants allegedly failed to address the unconstitutional practices, thereby fostering a "policy or custom" of use of excessive force.  *Id.*  The court decided, however, that plaintiff's conclusory allegations "[did] not reach the requisite level of plausibility" to survive defendants' motion to dismiss.  *Id.* (citing *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570).  The plaintiff had pointed to only two cases of excessive force, both of which occurred "several years prior to the alleged violence against him[,] and the existence of reports from unspecified time periods which would have reported violence at New York City detention facilities."  *Id.*  The court explained that due to the passage of time and changeover in supervisory staff (including a new DOC commissioner) between prior incidents and the plaintiff's case, the plaintiff had not "sufficiently alleged that the violence which harmed him was part of a larger policy or custom at the DOC."  *Id.*; *see also id.* at 469–70 ("[T]he prior violent incidents relied upon by Plaintiff are too

attenuated and isolated from his own injury to plausibly establish (a) a policy or custom of violence against prisoners, and (b) that his injury was linked to that policy or custom.").

Here, Plaintiff has not claimed that Pallito created, or knew about, an official or de facto DOC policy that tolerated constitutional violations.[6]  Plaintiff's TAC makes allegations that are analogous to the claims in the plaintiff's dismissed complaint in *Plair*, including contentions of Pallito's role in, and knowledge of, DOC contract oversight reports.  (*See* Doc. 108 at 7, ¶ 20.)  Plaintiff's claims do not rise to the level of detail of the plaintiff's failed allegations in *Plair* because Plaintiff has attached media reports concerning prior inmate deaths and injuries to her Response, not to her TAC.[7]  (*Compare* Doc. 108 *with* Doc. 124 at 6–7.)  Even if Plaintiff had properly raised the media's coverage of prior violations of inmates' rights in the TAC, these incidents are "too attenuated and isolated" from Hutt's injury.  *See Plair*, 789 F. Supp. 2d at 470.  I thus find that Plaintiff's TAC does not allege "more than a sheer possibility" of Pallito's personal involvement under the third *Colon* factor.  *Iqbal*, 556 U.S. at 678.

---

[6]  While Plaintiff makes this claim with respect to CCA, she does not regarding CCS.  (*See* Doc. 108 at 4, ¶ 6 ("In its treatment of Mr. Hutt, at the Florence Correctional Center (FCC) in Florence, Arizona, Defendants CCA and Pallito knew of, supported, adopted, approved and ratified the policy, custom, or practice of ignoring and violating the constitutional rights of Mr. Hutt.").)

[7]  See discussion in Part IV, *infra*, that on a Motion to Dismiss, this court considers the sufficiency of the allegations in the Complaint alone.  *See, e.g., Iqbal*, 556 U.S. at 678; *see also Stilley v. Am. Chambers Life Ins. Co.*, No. 91 Civ. 7022 (RLC), 1992 WL 147906, at *2 (S.D.N.Y. June 18, 1992) ("[B]riefs do not constitute evidence that the court can consider on a motion to dismiss."); *McBride v. Merrell Dow & Pharm., Inc.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) ("Considering an argument advanced for the first time in a reply brief . . . is not only unfair to an appellee, but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered." (citation omitted)).

Under the fourth *Colon* factor, a defendant also may be personally liable for constitutional violations if he was grossly negligent in his supervision of subordinates responsible for the violations.  This court has held, however, that employees of contractors "are not subordinates of state correctional officials."  *Seifert v. Corr. Corp. of Am.*, No. 2:09 CV 119, 2010 WL 446969, at *5 (D. Vt. Feb. 1, 2010) (adopting report and recommendation) (citing *Means v. Lambert*, No. CIV–06–1137–HE, 2008 WL 281551, at *5 (W.D. Okla. Jan. 31, 2008) (holding that because the state DOC and CCA were "related by contract rather than employment . . . CCA personnel cannot be considered 'subordinates' of the [state DOC's] employees' as a matter of law")).

Additionally, as Pallito points out, supervisors without medical training are entitled to rely on the medical expertise of their subordinates.  (Doc. 117 at 8); *see, e.g.*, *Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2d Cir. 2000) (holding that it was, "as a matter of law, objectively reasonable" for the facility Health Services Administrator and warden to refrain from prescribing the plaintiff's medical treatment, and warning of the "repercussions if non-medical prison officials were to attempt to dictate the specific medical treatment to be given to particular prisoners"); *Joyner v. Greiner*, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) ("[A] prison administrator is permitted to rely upon and be guided by the opinions of medical personnel concerning the proper course of treatment administered to prisoners, and cannot be held to have been 'personally involved' if he does so."); *Hanrahan v. Menon*, No. 9:07–CV–610, 2010 WL 6427650, at *12 (N.D.N.Y. Dec. 15, 2010) (finding that a prison administrator who denied plaintiff's grievance and did not correct the decisions of medical staff could not "be liable under Section 1983 for

failure to supervise the prison medical staff, because he lack[ed] the medical training and authority to do so").

Plaintiff claims that Pallito's failure to monitor CCS's and Drs. Miller and Rapaport's adherence to the medical care contracts was grossly negligent, given the pattern of DOC contractors providing deficient medical care and Pallito's involvement on a taskforce to address this problem in the past.  (Doc. 108 at 2; *see also id.* at 15–16, ¶¶ 73, 74–76.)  Because CCS is a contractor, its employees were not Pallito's subordinates, and thus he cannot be held liable on a theory of supervisory liability.  *See Seifert*, 2010 WL 446969, at *5.  Even if Pallito did have this authority, he did not have the medical background or training to question Hutt's treatment and diagnoses by CCS and its medical personnel.  *See, e.g.*, *Cuoco*, 222 F.3d at 11.  Therefore, Plaintiff fails to sufficiently allege Pallito's personal involvement under this prong of *Colon*.

Finally, under the fifth *Colon* factor, personal involvement can be established if the plaintiff alleges that the defendant was deliberately indifferent to information regarding constitutional violations.  In the November 2015 Report and Recommendation, it was determined that Plaintiff's SAC was devoid of sufficient factual allegations to support reliance on *Colon*'s fifth factor.  (Doc. 91 at 13 n.8.)  To the extent that Plaintiff's claims against Pallito survived the previous Motion to Dismiss granted by this court (*id.*; *see also* Doc. 109 (adopting Report and Recommendation)), Plaintiff has not added any substantive factual allegations that would indicate Pallito received and ignored information indicating unconstitutional acts were occurring.  Therefore, Plaintiff's TAC

remains insufficient to establish Pallito's personal involvement under the fifth *Colon* factor.

Accordingly, because Plaintiff has failed to sufficiently allege Pallito's personal involvement in the purported constitutional violations, I recommend that Pallito's Motion to Dismiss (Doc. 117) be GRANTED regarding these claims.

## IV.    Eighth Amendment Claim Against Pallito

Assuming that Pallito was personally involved in Hutt's medical treatment, the TAC fails to sufficiently allege that Hutt's Eighth Amendment rights were violated. Plaintiff's remaining Eighth Amendment claims with respect to Pallito are that: Pallito entered into a contract with CCS, with actual or constructive knowledge that CCS provided substandard medical care to inmates; and he failed to monitor contract compliance and ensure that Hutt was provided with proper medical care.  (*See* Doc. 108 at 6, ¶ 13; 7, ¶ 20; 9, ¶ 35; 12, ¶ 50.)  Pallito argues that Plaintiff's allegations "are insufficient to establish either that Commissioner Pallito was aware of facts supporting an inference that Plaintiff was at substantial risk of harm or that he ignored such risk," as required for a successful Eighth Amendment claim.[8]  (Doc. 117 at 10.)

_____

[8] Pallito also argues that Plaintiff's allegations that he failed to monitor CCA's contract performance constitute a contract claim that Plaintiff does not have standing to bring.  (Doc. 117 at 12–13.)  Pallito notes that the DOC-CCA contract explicitly stated that "all rights of action relating to . . . enforcement [of the Agreement], shall be strictly reserved to the VTDOC and the Contractor, and nothing contained in this Agreement shall give or allow any claim or right of action whatsoever by any other person on this Agreement."  (*Id.* at 12 (quoting Doc. 94-4 at § 37).)  To the extent that Pallito is also arguing that Plaintiff does not have standing to challenge the DOC-CCS contract, the court cannot address this argument, as the DOC-CCS contract has not been included in the parties' pleadings and thus is not before the court.

The Eighth Amendment "forbids 'deliberate indifference to serious medical needs of prisoners.'" *Spavone*, 719 F.3d at 138 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).[9] Deliberate indifference must be established both objectively and subjectively. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). "The objective component requires that 'the alleged deprivation . . . be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists.'" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway*, 99 F.3d at 553). Under the subjective requirement, "the charged officials must be subjectively reckless in their denial of medical care," meaning that they acted or failed to act "while *actually aware* of a substantial risk that serious inmate harm will result." *Spavone*, 719 F.3d at 138 (second quoting *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006)). That mental state exists when a "prison official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Hathaway*, 99 F.3d at 553 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[T]he subjective element of deliberate indifference 'entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* (second and third alterations in original) (quoting *Farmer*, 511 U.S. at 835).

---

[9] For state prisoners, the Eighth Amendment is applied to the states through the Fourteenth Amendment. *See Caiozzo v. Koreman*, 581 F.3d 63, 69 n.3 (2d Cir. 2009).

The parties do not dispute that the deliberate indifference objective requirement is met here.  (*See* Doc. 117 at 10; Doc. 124 at 3 ("There is no dispute that Mr. Hutt's condition[—]his undiagnosed osteosarcoma[—]was a condition serious enough to produce death.").)  With regard to the subjective requirement, I find that Plaintiff has not made a plausible claim that Pallito knew, or should have known, of an excessive risk to Hutt's health, and disregarded this risk.

As discussed in the November 2015 Report and Recommendation, there is minimal case law addressing whether an official's decision to enter into a contract, and the failure to monitor the services provided under the contract, without more can give rise to a deliberate indifference claim.  (Doc. 91 at 19.)  However, Pallito cites to *Means v. Lambert*, 2008 WL 281551, which guides the analysis here.  In *Means*, an inmate at a correctional facility in Wyoming brought a § 1983 claim against defendants, including the state DOC director and housing and classification manager, "for failing to monitor the contract between Wyoming and [the correctional facility]."  *Id.* at *1.  While the plaintiff did not claim that the DOC director and housing and classification manager were directly involved in the underlying constitutional violations, he asserted their liability on the basis of their failure to "supervise and monitor their own contract with defendant [CCA]" and CCA's personnel.  *Id.* at *5 (alteration in original) (citation omitted).  The court rejected this claim, stating: "No court has ever stretched supervisory liability to cover the supervision of an object rather than a person.  The [c]ourt should reject this theory as a matter of law and dismiss the . . . causes of action against [the DOC officials] for failure to state a valid claim."  *Id.*

As in *Means*, Plaintiff here makes no claim that Pallito was personally responsible for Hutt's medical care. Instead, Plaintiff's claims against Pallito rest on his decision to contract with CCS and his alleged failure to monitor the services delivered under this contract. I agree with the decision in *Means* that supervisory liability does not extend to the supervision of a contract.[10] I thus conclude that Plaintiff has not asserted a plausible claim that Pallito acted with deliberate indifference in violation of Hutt's Eighth Amendment Rights.

Even if this court were to assume that Pallito *could* be liable on the basis of contract oversight, Pallito's actions nevertheless do not constitute deliberate indifference under the Eighth Amendment. As I discussed in the November 2015 Report and Recommendation, *Smith v. District of Columbia*, 413 F.3d 86 (D.C. Cir. 2005) addresses whether an official's decision to contract with a contractor, and failure to monitor the contractor's services, can constitute deliberate indifference. (Doc. 91 at 19–21.) In *Smith*, the D.C. Circuit determined that there was sufficient evidence for a jury to find that the District of Columbia was deliberately indifferent to the safety of delinquent youths in its custody when it contracted with Education Solutions Academy (ESA) to provide an independent living facility for these individuals. 413 F.3d at 99.

---

[10]   This court has also cited the *Means* decision for the proposition that CCA employees are not DOC personnel for the purposes of supervisory liability because the relationship between the DOC and CCA is one of contract, rather than employment. *See Seifert*, 2010 WL 446969, at *5; *Bain v. Hofman*, File No. 2:08 CV 110, 2009 WL 959978, at *4 (D. Vt. Apr. 3, 2009); *Soulier v. Hofmann*, No. 2:08–CV–40, 2009 WL 249634, at *5 (D. Vt. Feb. 2, 2009).

The facts of *Smith* are discussed in detail in the court's November 2015 Report and Recommendation.  (*See* Doc. 91 at 19–21.)  As explained in the Report and Recommendation, the case suggests that when an official who is tasked with setting standards for selecting and monitoring contractors fails to do so, he or she might be liable to the extent that the need for better standards is obvious, and the inadequacy of current standards is likely to result in a violation of constitutional rights.[11]  Plaintiff's TAC fails to state a plausible claim under this test.

As discussed above, Plaintiff's remaining Eighth Amendment allegations against Pallito are that he entered into a contract with CCS, with knowledge of its provision of substandard medical care (based on the contract price and a 2004 Vermont Auditor's Report), and that Pallito failed to monitor CCS's compliance with the contract.  (*See* Doc. 108 at 6, ¶ 13; 7, ¶ 20; 9, ¶ 35; 12, ¶ 50.)  Plaintiff's assertion that Pallito improperly contracted with CCS is insufficient to plausibly allege an Eighth Amendment claim.  Like the SAC, the TAC does not include any allegations regarding what process Pallito used to select CCS, what the contract price was, and how Pallito would have known that it was insufficient.  By contrast to the misconduct alleged in *Smith*, Plaintiff does not allege that Pallito failed to have *any* criteria for selecting CCS.  Plaintiff also does not allege that contracting with CCS was particularly improper in light of factors such as its experience and licensing, as the plaintiff in *Smith* had alleged.

---

[11]  The *Smith* appeal, however, did not directly involve any determination about a *policymaker's* liability because the jury did not find the District's Youth Services Administrator liable.  413 F.3d at 102 (concluding that there was no inconsistency in the jury verdict holding the District liable, but not the Youth Services Administrator, because the jury could have determined that the administrator was new to the job and focused on other juvenile facilities).  I nevertheless find the case instructive with respect to Plaintiff's claims against Pallito.

Plaintiff's allegations regarding the Vermont Auditor's Report are similarly unavailing.  First, Plaintiff does not specifically allege that this report involved CCS.  (*See* Doc. 108 at 7, ¶ 20.)  Second, Plaintiff cites no authority requiring state corrections departments to contract only with corrections companies with clear records of satisfactory contractual performance.  And even assuming that some contractors' records of performance could be so abysmal that selecting them to provide services might amount to deliberate indifference, Plaintiff does not allege such a circumstance (even after this court pointed out Plaintiff's failure to do so in her SAC (Doc. 91 at 22)).  The 2004 report that Plaintiff references predates the DOC's contract with CCS and indicates nothing about CCS's performance as a provider of medical care; in fact, CCS is not even mentioned in the context of this report (whereas CCA is).  (*See* Doc. 108 at 7, ¶ 20.)  For these reasons, I conclude that Plaintiff has failed to state a plausible claim that Pallito's standards for selecting CCS were obviously inadequate and likely to result in violations of constitutional rights.

Plaintiff's claim that Pallito failed to monitor (or have in place a procedure to monitor) the quality of the medical care delivered by CCS is similarly conclusory in the context of a deliberate indifference claim.  The TAC merely asserts that Pallito "did not oversee the medical services provided to Mr. Hutt or otherwise arrange for proper medical services," and "failed to monitor contract compliance . . . resulting in an environment that permitted substandard medical treatment."  (Doc. 108 at 9, ¶ 35; 12, ¶ 50.)  These bare assertions again fail to nudge Plaintiff's Eighth Amendment claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  The TAC

does not address whether the contract with CCS included a contract management and monitoring process. Furthermore, unlike the plaintiff in *Smith*, Plaintiff here does not claim that Pallito failed to respond to problems at CCS facilities, that he did not ensure CCS had implemented proper staffing and safety standards, or that he refused to confirm CCS had the proper experience and licensing to carry out the contracted services.

In her Response, Plaintiff argues that "[t]he media coverage regarding Vermont inmates and the problems with contracts with out-of-state prisons is not insignificant in establishing deliberate indifference . . . ." (Doc. 124 at 6.) Plaintiff relies on *Fisher v. Miami-Dade Cty.*, 114 F. Supp. 3d 1247 (S.D. Fla. 2015), wherein the court held that the plaintiff had successfully alleged that county policymakers were deliberately indifferent to inmates' medical needs, relying in part on widespread media reports of constitutional violations (among many other detailed allegations of wrongdoing, including Department of Justice investigations and over 100 inmate deaths linked to constitutional violations). *Id.* at 1249. Here however, unlike in *Fisher*, Plaintiff's assertions about media coverage are not mentioned in the TAC. (*See* Doc. 132 at 5.) Thus, they are not considered by the court. *See, e.g.*, *Gallery 13, Ltd. v. Easter*, No. 93 CIV. 8865 (KMW), 1995 WL 258143, at *2 (S.D.N.Y. May 2, 1995) ("[S]ince the allegations [in plaintiff's memorandum of law submitted in opposition to the motion to dismiss] are not supported by affidavits or other evidence, they are not to be considered on this motion to dismiss."); *Stilley v. Am. Chambers Life Ins. Co.*, No. 91 Civ. 7022 (RLC), 1992 WL 147906, at *2 (S.D.N.Y. June 18, 1992) ("[B]riefs do not constitute evidence that the court can consider on a motion to dismiss."). Moreover, Plaintiff's allegations regarding the media attention are focused on

26

Pallito's gross negligence with respect to CCA, not CCS. (Doc. 124 at 7 (arguing that Pallito's commentary in news reports "underscores his gross negligence in failing to provide on-site monitoring of *CCA at FCC*") (emphasis added).) Thus, Plaintiff has failed to state a plausible claim that Pallito's standards for monitoring CCS were obviously inadequate and likely to result in violations of constitutional rights.

Accordingly, I conclude that Plaintiff has failed to state a plausible deliberate indifference claim, and I recommend that Plaintiff's Eighth Amendment claim against Pallito be DISMISSED.

## IV.    State Law Claims—Vermont Tort Claims Act and Absolute Immunity

Plaintiff again asserts a variety of state law claims against Pallito in her TAC: negligent medical care and treatment (Count Two); gross negligence (Count Three); negligence (Count Six); and wrongful death (Count Seven).[12] (Doc. 108 at 14–19.) Pallito asserts that all of these claims should be dismissed because they are precluded by the VTCA and because he enjoys absolute immunity from tort liability. (Doc. 117 at 16–20.) Plaintiff does not explicitly address Pallito's VTCA claim, but argues that Pallito cannot be protected by absolute immunity because he was not acting within the authority of his office when the alleged constitutional violations occurred. (Doc. 124 at 9.)

### A.    Sovereign Immunity and the VTCA

Plaintiff's state law claims are barred by sovereign immunity. Sovereign immunity prohibits claims against the state "unless immunity is expressly waived by

---

[12] Count Five in the TAC also asserts Pallito's involvement in the medical malpractice claim. (*See* Doc. 108 at 17.) This count should be summarily dismissed, however, given that Plaintiff alleged Pallito's involvement in this claim in her SAC as well (*see* Doc. 61 at 17), and at oral argument on the SAC, Plaintiff's counsel agreed that Pallito should not have been included in this count.

statute." *Kane v. Lamothe*, 2007 VT 91, ¶ 6, 182 Vt. 241, 244, 936 A.2d 1303, 1306

(quoting *Sabia v. State*, 164 Vt. 293, 298, 699 A.2d 1187, 1191 (1995)).  The VTCA only

waives Vermont's sovereign immunity when "lawsuits resulting from state employee

torts [are] brought '(1) solely against the State of Vermont and (2) exclusively in

Vermont superior courts.'"  *Jones v. Pallito*, No. 2:14–cv–199, 2015 WL 2376347, at *10

(D. Vt. May 18, 2015) (quoting *Rheaume v. Tallon*, No. 1:07–cv–262, 2009 WL 385422,

at *2 (D. Vt. Feb. 12, 2009)) (citing Vt. Stat. Ann. tit. 12, §§ 5601(a), 5602(a)).

 A tort action may, however, be brought against a state employee directly (rather

than against the State of Vermont), if that individual acted with "gross negligence or

willful misconduct."  Vt. Stat. Ann. tit. 12, § 5602(b).  "Gross negligence is a 'heedless

and palpable violation of legal duty respecting the rights of others.'"  *Kane*, 2007 VT 91,

¶ 12 (quoting *Shaw v. Moore*, 104 Vt. 529, 531, 162 A. 373, 374 (1932)).  It consists of

"more than an error of judgment" and exists when the state employee fails "to exercise

'even a slight degree of care' owed to another."  *Id.* (first quoting *Hardingham v. United

Counseling Serv. of Bennington Cty., Inc.*, 164 Vt. 478, 481, 672 A.2d 480, 482 (1995);

then quoting *Mellin v. Flood Brook Union Sch. Dist.*, 173 Vt. 202, 220, 790 A.2d 408,

423 (2001)).  For example, in *Kane*, the Vermont Supreme Court determined that the

plaintiff had not established a state trooper's gross negligence, despite allegations that

"the trooper responded to a report of domestic violence, found [plaintiff] bruised and

bleeding . . . , interviewed her within earshot of her boyfriend, and left without arresting

the boyfriend."  2007 VT 91, ¶ 12.  The court explained that even if "the trooper might

have better investigated the matter and exercised his discretion differently, plaintiff

nevertheless failed to set forth a wholesale absence of care or indifference to duty owed to her, as is necessary to state a viable claim for gross negligence." *Id.* ¶ 13.

Here, Plaintiff has brought her claims in the wrong court and against the wrong party under the VTCA. Specifically, Plaintiff has incorrectly asserted her state law claims in this court rather than in a Vermont superior court, and she has incorrectly brought these claims against Pallito rather than against the State of Vermont. (*See* Doc. 117 at 17 (citing Vt. Stat. Ann. tit. 12, §§ 5601(a), 5602(a)).) Plaintiff does not address these issues in her response to Pallito's Motion, nor does she address the VTCA in her TAC. (*See* Docs. 108; 124.) To the extent Plaintiff relies on her allegations that Pallito was grossly negligent in other parts of her TAC (such as in her deliberate indifference claims) to trigger the VTCA exception allowing suits against state employees, Plaintiff has not made a plausible claim of gross negligence, for largely the same reasons that she has failed to state a deliberate indifference claim.

The Vermont Supreme Court has held that gross negligence is "more than simple incompetence, but less than actual knowledge." *Estate of Rodriguez v. Simon*, No. 2:06–CV–125, 2007 WL 2154238, at *6 (D. Vt. Mar. 30, 2007) (citation and internal quotation marks omitted), *report and recommendation adopted*, 2007 WL 2107542 (D. Vt. July 19, 2007). The concepts of gross negligence and deliberate indifference are "not literally coextensive," *Doe v. N.Y.C. Dep't of Soc. Servs.*, 649 F.2d 134, 143 (2d Cir. 1981); "gross negligence is slightly closer to the negligence end of the spectrum than deliberate indifference," *Estate of Rodriguez*, 2007 WL 2154238, at *6. Applied here, not only does the TAC fail to adequately plead deliberate indifference, it also fails to adequately

29

plead gross negligence. The TAC's allegations are insufficient to reasonably conclude that Pallito committed a "heedless and palpable violation of legal duty," *Kane*, 2007 VT 91, ¶ 12 (quoting *Shaw*, 104 Vt. at 531, 162 A. at 374), and that the need for more or different standards for selecting and monitoring CCS was "so obvious that it should be known," *Estate of Rodriguez*, 2007 WL 2154238, at *6 (quoting *Farmer*, 511 U.S. at 836). Additionally, Plaintiff's TAC does not reach the level of detail of the plaintiff's complaint in *Kane*, much less make any allegations against Pallito that are as egregious as plaintiff's claims against the state trooper in that case, where the Vermont Supreme Court nevertheless did not find a plausible showing of gross negligence. Accordingly, the gross negligence exception does not apply here, and Plaintiff's state law claims against Pallito are barred by the VTCA.

### B.    Absolute Official Immunity

Plaintiff's state law claims against Pallito are also barred by absolute official immunity. Absolute immunity protects "judges, legislators[,] and *the state's highest executive officers*" from litigation where the plaintiff's claims are based on the official's actions in the course of his or her official duties. *Brady v. Pallito*, No. 5:12–cv–41, 2013 WL 2632780, at *4 (D. Vt. June 11, 2013) (alteration in original) (quoting *LaShay v. Dep't of Soc. & Rehab. Servs.*, 160 Vt. 60, 64, 625 A.2d 224, 227 (1993)); *see also Libercent v. Aldrich*, 149 Vt. 76, 81, 539 A.2d 981, 984 (1987). "The Vermont Supreme Court has held that the Commissioner of Corrections is among Vermont's 'highest executive officers' for immunity purposes, and thus is protected by absolute immunity so long as the acts attributed to him are within the 'the scope of [his] authority.'" *Brady*,

2013 WL 2632780, at *4 (alteration in original) (quoting *Curran v. Marcille*, 152 Vt. 247, 249, 565 A.2d 1362, 1363 (1989)).

Plaintiff's claims here do not suggest that any of Pallito's alleged acts or omissions regarding the selection and monitoring of CCS were outside the scope of his authority as Commissioner.  Plaintiff cites no support for her assertion that Pallito "failed to perform within the 'general authority of his office'" and thus was not protected by absolute immunity.  (Doc. 124 at 9 (quoting *O'Connor v. Donovan*, 2012 VT 27, ¶ 9, 191 Vt. 412, 418, 48 A.3d 584, 588).)  In fact, Plaintiff's TAC suggests the opposite— Plaintiff specifically asserts that the "acts or omissions by all Defendants were conducted *within the scope of their official duties and employment*."  (Doc. 108 at 13, ¶ 58 (emphasis added).)  Moreover, Pallito's contract with CCS fits squarely within his statutory authority.  For example, 28 V.S.A. § 102(b) grants the Commissioner the authority to "order the assignment and transfer of persons committed to the custody of the Commissioner to correctional facilities, including out-of-state facilities," and the power to "contract for services."  Vt. Stat. Ann. tit. 28 §§ 102(b)(5), 102(b)(11).  Accordingly, Pallito's absolute official immunity bars Plaintiff's claims against him.

## V.    Leave to Amend

Under Federal Rule of Civil Procedure 15(a), leave to amend should be "freely give[n] when justice so requires."  Fed. R. Civ. P. 15(a)(2); *see also Local 802, Associated Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998) (recognizing the "broad" discretion of the district court to grant leave to amend).  However, leave to amend may be denied when the moving party manifests a "repeated

failure to cure deficiencies by amendments previously allowed," and when further amendment would be futile.  *Local 802*, 145 F.3d at 89 (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003).

Plaintiff has had three opportunities to amend her complaint in this case.  (*See* Docs. 31, 49, 53, 60, 94, 107.)  Plaintiff has seemingly ignored the basis for court's prior dismissals of her claims against Pallito (*see* Docs. 91, 109), and has made little, if any, effort to add details or evidence to her allegations in subsequent iterations of her complaint.  To the extent that Plaintiff has attempted to bolster her pleadings, the information she has added has been duplicitous and even contradictory to her own allegations, as discussed above.  (*Compare* Doc. 94-4 (DOC-CCA contract attached to Motion for Leave to Amend SAC) at 1, 7, 9, 15, 33, 54 *with* Doc. 108 (TAC) at 5–6, ¶ 12 (contract indicating a different timeline and different contract prices than alleged in the TAC).)  Plaintiff has thus "repeated[ly] fail[ed] to cure deficiencies" from previous amendments.  *Local 802*, 145 F.3d at 89.

Moreover, amendment would be futile because Plaintiff's claims against Pallito fail as a matter of law, as discussed above.  When, as here, better pleading will not cure a complaint's defects, leave to amend should be denied.  *See Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990).  Finally, Plaintiff is represented by counsel and thus the court need not concern itself with "protect[ing] *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training."  *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983).  I therefore recommend that the court decline to grant Plaintiff leave to amend her TAC.

## Conclusion

Pursuant to the law of the case doctrine, and for the reasons stated in the court's prior orders regarding earlier versions of the complaint (*see* Docs. 91, 109), I recommend that the court DISMISS Plaintiff's claims against Pallito in her TAC (Doc. 108). Alternatively, if the court elects to revisit the substance of Plaintiff's claims in the context of Pallito's Motion to Dismiss (Doc. 117), I recommend that the Motion be GRANTED for the reasons discussed above, and summarized as follows:

1. Plaintiff has failed to sufficiently plead Pallito's personal involvement in the alleged constitutional violations.  Thus, the claims for monetary damages against Pallito in his personal capacity should be DISMISSED.  *See supra* pp. 13–19.

2. Plaintiff has failed to state a claim under the Eighth Amendment because she has not alleged Pallito's deliberate indifference with respect to Hutt's medical care. Therefore, the claims against Pallito for monetary damages should be DISMISSED.  *See supra* pp. 19–26.

3. Plaintiff's state law claims are barred by the VTCA and by Pallito's absolute immunity.  Therefore, the state law claims against Pallito should be DISMISSED. *See supra* pp. 26–30.

Dated at Burlington, in the District of Vermont, this 21st day of November, 2016.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within 14 days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).  Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).